RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0224p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOHN DOE,

> *Plaintiff-Appellee,*

No. 16-4693

*v.*

UNIVERSITY OF CINCINNATI; ANIESHA MITCHELL; JUAN GUARDIA,

> *Defendants-Appellants.*

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:16-cv-00987—Michael R. Barrett, District Judge.

Argued: August 1, 2017

Decided and Filed: September 25, 2017

Before: CLAY, GRIFFIN, and THAPAR, Circuit Judges.

---

## COUNSEL

**ARGUED:** Evan T. Priestle, TAFT, STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellants. Joshua Adam Engel, ENGEL & MARTIN, LLC, Mason, Ohio, for Appellee. **ON BRIEF:** Evan T. Priestle, Doreen Canton, TAFT, STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellants. Joshua Adam Engel, ENGEL & MARTIN, LLC, Mason, Ohio, for Appellee.

-------------------

**OPINION**

-------------------

GRIFFIN, Circuit Judge.

On September 6, 2015, University of Cincinnati students John Doe and Jane Roe[1] engaged in sex at John Doe's apartment. John contends that the sex was consensual; Jane claims it was not. No physical evidence supports either student's version.

After considerable delay, defendant University of Cincinnati ("UC") held a disciplinary hearing on Jane Roe's sexual assault charges against graduate student John Doe. Despite Jane Roe's failure to appear at the hearing, the University found John Doe "responsible" for sexually assaulting Roe based upon her previous hearsay statements to investigators. Thereafter, UC suspended John Doe for two years—reduced to one year after an administrative appeal.

Plaintiff Doe appealed his suspension to the district court, arguing that the complete denial of his right to confront his accuser violated his due process right to a fair hearing. In granting a preliminary injunction against Doe's suspension, the district court found a strong likelihood that John Doe would prevail on his constitutional claim. So do we, and for the reasons stated herein, affirm the order of the district court.

The Due Process Clause guarantees fundamental fairness to state university students facing long-term exclusion from the educational process. Here, the University's disciplinary committee necessarily made a credibility determination in finding John Doe responsible for sexually assaulting Jane Roe given the exclusively "he said/she said" nature of the case. Defendants' failure to provide any form of confrontation of the accuser made the proceeding against John Doe fundamentally unfair.

-------------------

[1]We use aliases to protect the parties' privacy.

I.

John Doe met Jane Roe on Tinder, and after communicating for two or three weeks, met in person. Thereafter, Doe invited Roe back to his apartment, where the two engaged in sex. Three weeks later, Jane Roe reported to the University's Title IX Office that John Doe had sexually assaulted her that evening in his apartment. Five months later, UC cited Doe for violating the Student Code of Conduct, "most specifically," the University's policies against sex offenses, harassment, and discrimination.

UC resolves charges of non-academic misconduct through an Administrative Review Committee (ARC) hearing process. The process begins when "[a]ny person, department, organization or entity" files a complaint against a student, and the University informs the student of the allegations against him. If the claim involves a potential sexual offense, UC's Title IX Office investigates the matter, interviewing both parties and gathering the evidence. Defendant Aniesha Mitchell, the Director of UC's Office of Student Conduct and Community Standards, discloses the evidence to the accused student before the hearing.

During the hearing, the ARC panelists (a mix of faculty and students) hear the allegations, review the evidence, and question the participating witnesses. Accused students are entitled to present favorable evidence and explain their side of the story in their own words. They may also question witnesses through a "circumscribed form of cross-examination"—one that involves "submitting written questions" to the ARC panelists, "who then determine whether [the] questions are relevant and whether they will be posed to the witness." *Doe v. Cummins*, 662 F. App'x 437, 439, 448 (6th Cir. 2016).

However, there is no guarantee that a witness will appear for questioning. "Witnesses are strongly encouraged to be present for hearings," but UC's Code of Conduct does not require them to be present, regardless of whether they are the accused, the accuser, or a bystander with relevant information. If a witness is "unable to attend," the Code permits him to submit a "notarized statement" to the Committee in lieu of an appearance. At the close of the hearing, the ARC deliberates and determines whether the accused student should be found "responsible" for violating the Code of Conduct.

Defendants planned to follow these procedures at Doe's June 27, 2016, hearing, but modified the process when Jane Roe failed to appear. The Committee Chair explained how the hearing would proceed in her absence:

> So, during the hearing, the Administrative Review Committee and both the respondent and complainant shall have the right to submit evidence and written questions to be asked of all adverse witnesses who testify in the matter. The hearing chair, in consultation with the ARC, has the right to review and determine which written questions will be asked. Questions will be asked in the order presented by the Chair. And all questions from the complainant and respondent must be submitted in writing for review by the ARC [C]hair.
>
> Again, there is no complainant here and we have no witnesses. So we likely won't have to do any of this.

John Doe claims, and defendants do not dispute, that he was not informed in advance that Jane Roe would not be attending the hearing.

The Chair recited the Code of Conduct violations leveled against Doe and invited him to enter an "understanding"—accepting or denying responsibility for the allegations. Doe entered an understanding of not responsible.

The Chair then read a summary of the Title IX Office's report, which began with Jane Roe's account of the night in question, followed by Doe's account. Each party's account was based on his or her interview statements to the Title IX investigators and included remarks that would be hearsay if introduced in court. The Chair also read a summary of witness statements from four of Jane Roe's friends who were told of the alleged sexual assault through Roe. Once the Chair finished, he gave the Committee members the chance to ask questions regarding the report. They had none.

> The Chair then asked whether John Doe had any questions:
>
> [The Chair]: Okay, so the complainant is not here. At this time I would have given Roe time to ask questions of the Title IX report. But again, they [sic] are not here. So we'll move on.
>
> So now, do you, as the respondent Mr. Doe, have any questions of the Title IX report?
>
> [Doe]: Well, since she's not here, I can't really ask anything of the report.

Is this the time where I would enter in like a situation where like she said this and that never could have happened? Because that's just—

[The Chair]: You'll have time here in just a little bit to direct those questions. Just—

[Doe]: Then no, I don't have any questions for the report.

With that, the Chair concluded the "Title IX presentation" portion of the hearing.

"And so now," the Chair explained that if Jane Roe had been present, he would have asked her to "read into the record what happened and [provide] any additional information." "The ARC would then have time to ask clarifying questions" of Roe, followed by Doe's opportunity to ask her questions. "Again," however, the Chair noted Roe was not present and "move[d] onto the next step"—asking Doe to "summarize what happened." Doe challenged a number of Roe's statements, and responded to the Committee's questions. Following this exchange, the Chair read Jane Roe's written closing statement into the record and invited Doe to give a responsive closing statement.

After its deliberations, the Committee submitted its recommended findings to Daniel Cummins, UC's Assistant Dean of Students. It recommended that Cummins find Doe responsible for violating the Student Code of Conduct and issue a two-year suspension. On July 7, Cummins notified John Doe that he had accepted the recommendation.

Doe appealed the decision the next day. The University's Appeals Administrator rejected Doe's appeal of the finding of responsibility, but recommended that his sentence be reduced to a one-year suspension to begin at the end of the fall 2016 semester, and conclude at the end of the fall 2017 semester—meaning Doe could not attempt to re-enroll in his graduate program until January 2018. Defendant Juan Guardia, the Assistant Vice President and Dean of Students, accepted the Administrator's recommendation and informed plaintiff on September 23, 2016, that this was the University's final decision.

## II.

Doe then filed this action against UC Administrators Guardia and Mitchell and the University in the district court. Plaintiff Doe claimed that defendants violated his due process

rights under the United States and Ohio Constitutions and discriminated against him in violation of Title IX.

On the same day he filed his complaint, Doe moved for preliminary relief enjoining UC from enforcing his suspension. Plaintiff's motion focused solely on defendants' failure "to permit John Doe to confront his accuser." Doe maintained that UC could not constitutionally find him responsible for sexually assaulting Roe without "any opportunity to confront and question" her. The district court agreed.

"In this case," the court reasoned, "the ARC Hearing Committee was given the choice of believing either Jane Roe or Plaintiff, and therefore, cross-examination was essential to due process." *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 711 (S.D. Ohio 2016). The fact that Doe could have submitted written questions to the Committee Chair, which the Chair could have put to Roe, had she appeared at the hearing, did not convince the district court otherwise. *Id.* at 712. And although UC's Code of Conduct permits absent witnesses who are "unable" to attend the hearing to provide notarized statements, the district court noted that Roe's closing statement was not notarized. Such a "significant and unfair departure[] from an institution's own procedures can," the court explained, "amount to a violation of due process." *Id.* (quoting *Furey v. Temple Univ.*, 730 F. Supp. 2d 380, 396–97 (E.D. Pa. 2010) (brackets omitted)).

The district court ruled that plaintiff demonstrated a strong likelihood of success on the merits of his due process claim, and that the remaining preliminary injunction factors weighed in favor of granting preliminary relief. *Id.* at 712. Accordingly, the court entered an order enjoining UC from suspending plaintiff. *Id.* Defendants timely appealed.

III.

In reviewing a district court's decision to grant a preliminary injunction, "we evaluate the same four factors that the district court does": (1) whether the movant has demonstrated a strong likelihood of success on the merits; (2) whether he would suffer irreparable injury without the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether issuing the injunction would serve the public interest. *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015) (internal quotation marks omitted). "We have often cautioned that these

are factors to be balanced, not prerequisites to be met." *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017). "At the same time, however, we have also held that 'a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.'" *Id.* (brackets and citation omitted). And in the case of a potential constitutional violation, "the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc, per curiam) (citation omitted).

We review a district court's legal conclusions de novo, its factual findings for clear error, and its ultimate decision to grant preliminary relief for abuse of discretion. *S. Glazer's*, 860 F.3d at 849. Practically speaking, this means "when we look at likelihood of success on the merits, we independently apply the Constitution, but we still defer to the district court's overall balancing of the four preliminary-injunction factors." *Planet Aid*, 782 F.3d at 323 (citation omitted).

IV.

State universities must afford students minimum due process protections before issuing significant disciplinary decisions. *See Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005); *see also Jaksa v. Regents of the Univ. of Michigan*, 597 F. Supp. 1245, 1248 (E.D. Mich. 1984), *aff'd* 787 F.2d 590 (6th Cir. 1986) (per curiam, unpublished) ("Whether plaintiff's interest is a 'liberty' interest, 'property' interest, or both, it is clear that he is entitled to the protection of the due process clause."). Suspension "clearly implicates" a protected property interest, and allegations of sexual assault may "impugn [a student's] reputation and integrity, thus implicating a protected liberty interest." *Cummins*, 662 F. App'x at 445 (citations omitted).

Because the Due Process Clause applies, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "[T]he specific dictates of due process generally require[] consideration of three distinct factors": (1) the nature of the private interest subject to official action; (2) the risk of erroneous deprivation under the current procedures used, and the value of any additional or substitute procedural safeguards; and (3) the governmental interest,

including the burden any additional or substitute procedures might entail.  *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

At a minimum, a student facing suspension is entitled to "the opportunity to be 'heard at a meaningful time and in a meaningful manner.'"  *Cummins*, 662 F. App'x at 446 (quoting *Mathews*, 424 U.S. at 333).  While the exact outlines of process may vary, universities must "at least" provide notice of the charges, an explanation of the evidence against the student, and an opportunity to present his side of the story before an unbiased decision maker.  *Id.* (citing *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 565–66 (6th Cir. 2011)).

A student's opportunity to share his version of events must occur at "some kind of hearing," *Goss v. Lopez*, 419 U.S. 565, 579 (1975), though that hearing need not "take on . . . [the] formalities" of a criminal trial.  *Flaim*, 418 F.3d at 635.  Education is a university's first priority; adjudication of student disputes is, at best, a distant second.  *See Bd. of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78, 88 (1978).  "Formalizing hearing requirements would divert both resources and attention from the educational process."  *Jaksa*, 597 F. Supp. at 1250.  Thus, UC is not required to "transform its classrooms into courtrooms" in pursuit of a more reliable disciplinary outcome.  *Id.*; *see also Flaim*, 418 F.3d at 635 ("Courts have generally been unanimous . . . in concluding that hearings need not be open to the public, that neither rules of evidence nor rules of civil or criminal procedure need be applied, and witnesses need not be placed under oath." (citations omitted)).  Even in the case of a sexual assault accusation—where "[a] finding of responsibility will . . . have a substantial and lasting impact" on the student, *see Cummins*, 662 F. App'x at 446—the protection afforded to him "need not reach the same level . . . that would be present in a criminal prosecution."  *Doe v. Univ. of Kentucky*, 860 F.3d 365, 370 (6th Cir. 2017).  Review under *Mathews* asks only whether John Doe "had an opportunity to 'respond, explain, and defend,'" not whether a jury could constitutionally convict him using the same procedures.  *Cummins*, 662 F. App'x at 446 (quoting *Flaim*, 418 F.3d at 635).

A.

First, Doe contends, and UC does not dispute, that the private interest at stake in this case is significant. A finding of responsibility for a sexual offense can have a "lasting impact" on a student's personal life, in addition to his "educational and employment opportunities," especially when the disciplinary action involves a long-term suspension. *Id.* The "private interest that will be affected by the official action" is therefore compelling. *Mathews*, 424 U.S. at 335.

B.

Next, we consider the risk of erroneous deprivation of this interest under the University's current procedures and the value of any additional procedural safeguards plaintiff requests. *Id.* at 334–35. The only additional procedure Doe requests is one that UC, in theory, already provides: the opportunity to confront and cross-examine Roe by posing questions to her through the Committee Chair.

"The right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings." *Winnick*, 460 F.2d at 549. However, general rules have exceptions, and "the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Goss*, 419 U.S. at 578 (citation and parenthetical omitted). The more serious the deprivation, the more demanding the process. And where the deprivation is based on disciplinary misconduct, rather than academic performance, "we conduct a more searching inquiry." *Flaim*, 418 F.3d at 634. "Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed." *Goss*, 419 U.S. at 580. For the student, "[t]he risk of error is not at all trivial, and it should be guarded against . . . without prohibitive cost or interference with the educational process." *Id.*

Accused students must have the right to cross-examine adverse witnesses "in the most serious of cases." *Flaim*, 418 F.3d at 636. We alluded to what "the most serious of cases" might entail in *Flaim*: If a case "resolve[s] itself into a problem of credibility, cross-examination of witnesses might . . . be[] essential to a fair hearing." *Id.* at 641 (quoting *Winnick*, 460 F.2d at

549). We ultimately did not reach that answer, however. It was not essential to Sean Michael Flaim's hearing, because Flaim admitted to the misconduct that prompted the Medical College of Ohio to expel him—his felony drug conviction. *Id.* That "rather unique" fact justified the College's decision to deny his request to cross-examine his arresting officer during Flaim's expulsion hearing. *Id.* at 641, 643.

But the circumstances of the present case pose the credibility contest we contemplated in *Flaim*: John Doe maintains that their sex was consensual; Jane Roe claims that it was not. Importantly, the Committee's finding of responsibility necessarily credits Roe's version of events and her credibility. The Title IX Office proffered no other evidence "to sustain the University's findings and sanctions" apart from Roe's hearsay statements. *Cf. Plummer v. Univ. of Houston*, 860 F.3d 767, 775–76 (5th Cir. 2017) (cross-examination not required where the plaintiffs distributed videos and a photograph of the victim's "degrading and humiliating" assault online, and "[t]he University's case did not rely on testimonial evidence" from the victim).

Defendants insist that Roe's nonappearance did not impact the fairness of the proceedings because Doe still had an opportunity be heard. The ARC panel invited him to "summarize what happened" in his own words, and Doe took advantage of that opportunity. He disputed Roe's overall interpretation of events and a number of her specific claims. Because plaintiff was able to draw attention to alleged inconsistencies in Roe's statements, defendants argue that cross-examination would have been futile. We disagree.

UC assumes cross-examination is of benefit only to Doe. In truth, the opportunity to question a witness and observe her demeanor while being questioned can be just as important to the trier of fact as it is to the accused. "A decision relating to the misconduct of a student requires a factual determination as to whether the conduct took place or not." *Horowitz,* 435 U.S. at 95 n.5 (Powell, J. concurring). "The accuracy of that determination can be safeguarded by the sorts of procedural protections traditionally imposed under the Due Process Clause." *Id.* Few procedures safeguard accuracy better than adversarial questioning. In the case of competing narratives, "cross-examination has always been considered a most effective way to ascertain truth." *Watkins v. Sowders*, 449 U.S. 341, 349 (1981) (footnote omitted); *see also Maryland v. Craig*, 497 U.S. 836, 846 (1990) (cross-examination "ensur[es] that evidence

admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings").

"The ability to cross-examine is most critical when the issue is the credibility of the accuser." *Doe v. Brandies Univ.*, 177 F. Supp. 3d 561, 605 (D. Mass. 2016). Cross-examination takes aim at credibility like no other procedural device. *Craig*, 497 U.S. at 846; *Watkins*, 449 U.S. at 349. A cross-examiner may "delve into the witness' story to test the witness' perceptions and memory." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). He may "expose testimonial infirmities such as forgetfulness, confusion, or evasion . . . thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Craig*, 497 U.S. at 847 (citation and brackets omitted). He may "reveal[] possible biases, prejudices, or ulterior motives" that color the witness's testimony. *Davis*, 415 U.S. at 316. His strategy may also backfire, provoking the kind of confident response that makes the witness appear more believable to the fact finder than he intended. *Watkins*, 449 U.S. at 345, 348–49; *cf. Davis*, 415 U.S. at 318 ("On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness."). Whatever the outcome, "the greatest legal engine ever invented for the discovery of truth" will do what it is meant to: "permit[] the [fact finder] that is to decide the [litigant]'s fate to observe the demeanor of the witness in making his statement, thus aiding the [fact finder] in assessing his credibility." *Craig*, 497 U.S. at 846 (quoting in part *California v. Green*, 399 U.S. 149, 158 (1970)).

Given the parties' competing claims, and the lack of corroborative evidence to support or refute Roe's allegations, the present case left the ARC panel with "a choice between believing an accuser and an accused." *Flaim*, 418 F.3d at 641. Yet, the panel resolved this "problem of credibility" without assessing Roe's credibility. *Id.* (citation omitted). In fact, it decided plaintiff's fate without seeing or hearing from Roe at all. That is disturbing and, in this case, a denial of due process.

Even in *Flaim*—where "cross-examination would have been a fruitless exercise" because the plaintiff student admitted the "critical fact[s]" against him—the trier of fact was still able to question the plaintiff's arresting officer, and the plaintiff was still "able to listen to and observe"

the officer's testimony. *See id.* at 633, 641 (quoting in part *Winnick*, 460 F.2d at 259). More critically, *the trier of fact* was "able to listen to and observe" the officer's testimony. *Id.* at 633. Evaluation of a witness's credibility cannot be had without some form of presence, some method of compelling a witness "to stand face to face with the [fact finder] in order that it may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States*, 156 U.S. 237, 242–43 (1895). Cross-examination is "not only beneficial, but essential to due process" in a case that turns on credibility because it guarantees that the trier of fact makes this evaluation on both sides. *Flaim*, 418 F.3d at 641. When it does, the hearing's result is most reliable.

Reaching the truth through fair procedures is an interest Doe and UC have in common. "The Due Process Clause will not shield [a student] from suspensions properly imposed, but it disserves both his interest and the interest of the State if his suspension is in fact unwarranted." *Goss*, 419 U.S. at 579. UC, of course, also has a "well recognized" interest in maintaining a learning environment free of sex-based harassment and discrimination. *Bonnell v. Lorenzo*, 241 F.3d 800, 822 (6th Cir. 2001). To that end, "ensuring allegations of sexual assault on college campuses are taken seriously is of critical importance, and there is no doubt that universities have an exceedingly difficult task in handling these issues." *Brandeis*, 177 F. Supp. 3d at 602 (citation omitted).

But if a university's procedures are insufficient to make "issues of credibility and truthfulness . . . clear to the decision makers," that institution risks removing the wrong students, while overlooking those it should be removing. *See Furey v. Temple Univ.*, 884 F. Supp. 2d 223, 252 (E.D. Pa. 2012). "The concern would be mostly academic if the disciplinary process were a totally accurate, unerring process, never mistaken and never unfair. Unfortunately, that is not the case, and no one suggests that it is." *Goss*, 419 U.S. at 579–80. Cross-examination, "the principal means by which the believability of a witness and the truth of his testimony are tested," can reduce the likelihood of a mistaken exclusion and help defendants better identify those who pose a risk of harm to their fellow students. *See Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 924 (6th Cir. 1988) (citation omitted).

We are equally mindful of Jane Roe's interest, and the extent to which it conflicts with John Doe's. Roe and other alleged victims have a right, and are entitled to expect, that they may attend UC without fear of sexual assault or harassment. *See* 20 U.S.C. § 1681(a). If they are assaulted, and report the assault consistent with the University's procedures, they can also expect that UC will promptly respond to their complaints. *Cf. Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) (citing *Wills v. Brown Univ.*, 184 F.3d 20, 25 (1st Cir. 1999)). Setting aside the troubling fact that UC's Title IX Office waited a month to interview Roe, another four months to notify Doe of her allegations, and *yet another four* months to convene the ARC hearing, the concern at this point is that UC's inadequate procedures left the ARC's decision vulnerable to a constitutional challenge.[2]

Strengthening those procedures is not without consequence for victims. "Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating" the same hostile environment Title IX charges universities with eliminating. *Doe v. Regents of the Univ. of Cal.*, 210 Cal. Rptr. 3d 479, 505 (Cal. Ct. App. 2016) (citation omitted). However, John Doe is not requesting an opportunity to question Jane Roe "directly." In this appeal, he does not challenge our determination in an unpublished decision that UC's "circumscribed form of cross-examination" is constitutional. *Cummins*, 662 F. App'x at 448. Rather, plaintiff asks only to question Roe through the ARC panel—a procedure the Department of Education's Office for Civil Rights previously recommended for the victim's wellbeing. Catherine E. Lhamon, Assistant Secretary for Civil Rights, *Questions and Answers on Title IX and Sexual Violence*, at 31, April 29, 2014, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (last visited Aug. 31, 2017). (The Department subsequently withdrew its April 29, 2014, letter, and replaced it with an interim letter. *See* Dep't of Educ., Office for Civil Rights, *Q&A on Campus Sexual Misconduct*, Sept. 22, 2017, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf (last visited Sept. 22, 2017)).

---

[2]UC encourages victims to report alleged assaults "as soon as reasonably possible" "to ensure that the passage of time does not limit the University's ability to conduct an investigation or locate witnesses, as memory lapses and other time-sensitive factors may impair an investigation." *See* https://www.uc.edu/titleix/procedures.html (last visited Aug. 31, 2017). "[T]ime-sensitive factors" evidently did not motivate the University in the instant case.

We acknowledge this procedure may not relieve Roe's potential emotional trauma. Still, a case that "resolve[s] itself into a problem of credibility" cannot itself be resolved without a mutual test of credibility, at least not where the stakes are this high. *Flaim*, 418 F.3d at 641 (quoting *Winnick*, 460 F.2d at 550); *but see Cummins*, 662 F. App'x at 448 (a plaintiff subject to disciplinary probation may be entitled to less process than one subject to suspension). "While protection of victims of sexual assault from unnecessary harassment is a laudable goal, the elimination of such a basic protection for the rights of the accused raises profound concerns." *Brandeis*, 177 F. Supp. 3d at 604–05. One-sided determinations are not known for their accuracy. Jane Roe deserves a reliable, accurate outcome as much as John Doe.

Ultimately, the ARC must decide whether Doe is responsible for violating UC's Code of Conduct: whether Roe's allegations against him are true. And in reaching this decision "[t]he value of cross-examination to the discovery of truth cannot be overemphasized." *Newsome*, 842 F.2d at 924. Allowing John Doe to confront and question Jane Roe through the panel would have undoubtedly aided the truth-seeking process and reduced the likelihood of an erroneous deprivation.

## C.

UC has a strong interest both "in eliminating sexual assault on its campus and establishing a fair and constitutionally permissible disciplinary system." *Doe*, 860 F.3d at 370. And in defendants' favor, we have recognized that a constitutionally permissible disciplinary system need not follow the rules of evidence. *See Flaim*, 418 F.3d at 635. Cross-examination can "unnecessarily formalize school expulsion proceedings" precisely because it "impos[es] the additional burden on school administrators of applying, to some extent, the rules of evidence." *Newsome*, 842 F.2d at 925 n.4. UC's administrators are "in the business of education, not judicial administration." *Flaim*, 418 F.3d at 640. "To saddle them with the burden of overseeing the process of cross-examination (and the innumerable objections that are raised to the form and content of cross-examination) is to require of them that which they are ill-equipped to perform." *Newsome*, 842 F.2d at 926.

These concerns informed our decision to approve UC's procedure in *Doe v. Cummins*, issued a week after the district court enjoined UC from suspending plaintiff.  *See* 662 F. App'x at 448.  *Cummins* held that UC's practice of limiting cross-examination to preapproved written questions comported with due process even if the ARC panel "did not ask all of the questions [the accused students] submitted," and did not permit follow-up questions.  *Id.* at 448.  But that holding gets defendants only so far.  Fear of "saddl[ing] school officials with the burden of overseeing . . . cross-examination" convinced the *Cummins* court that this "circumscribed form of cross-examination" is sufficient when a student's accuser appears for the hearing.  *See id.* (quoting *Newsome*, 842 F.2d at 926, brackets omitted).  The court left open the possibility that UC's procedures may nonetheless violate due process as applied to a student whose accuser *fails to appear* for the hearing.[3]  Sparing the ARC panel from having to navigate traditional cross-examination justifies the requirement for written preapproved questions, but it does not justify denying the opportunity to question an adverse witness altogether.

Defendants' better argument is that they cannot compel a witness (adverse or not) to attend the ARC hearing.  UC's Student Code of Conduct does not require witnesses to attend the hearing, and even if it did, there is no guarantee the witness would show.  Universities do not have subpoena power.  What is more, UC refers to cross-examination as an alternative to hearsay evidence, suggesting that the latter cannot be introduced at a disciplinary hearing unless the accused student has an opportunity to conduct the former.  While UC's concerns are not unfounded, both arguments lose sight of our limited holding in this case.

For one, defendants are not required to facilitate witness questioning at every nonacademic misconduct hearing.  *Flaim*'s dictate is narrow:  cross-examination is "essential to due process" only where the finder of fact must choose "between believing an accuser and an

---

[3]The two *Cummins* plaintiffs also faced charges of sexual assault, but successfully appealed the results of their first ARC hearings to UC's Appeals Administrator.  After a second round of hearings, UC found each student "responsible" for violating the Student Code of Conduct.  It suspended one for a three-year period and placed the other on disciplinary probation.  *Cummins*, 662 F. App'x at 438–43.  The latter plaintiff argued UC violated his due process rights because his alleged victim did not attend his second ARC hearing, denying him the opportunity to question her through the panel.  *Id.* at 448.  We found no violation, however, because the accused student had an opportunity to conduct cross-examination at his first hearing, and because UC gave him a lesser punishment—disciplinary probation rather than suspension.  *Id.*  *Cummins* did not address whether a student facing suspension who is denied even this modified form of cross-examination suffers a violation of due process.

accused." 418 F.3d at 641. The ARC panel need not make this choice if the accused student admits the "critical fact[s]" against him. *Id.* Another relevant factor is that UC's allegations against Doe rested solely on Roe's statements to investigators. Cross-examination may be unnecessary where the University's case "d[oes] not rely on testimonial evidence" from the complainant. *See, e.g.*, *Plummer*, 860 F.3d at 775–76.

For another, nothing in our decision jeopardizes UC's ability to rely on hearsay statements. *See Crook v. Baker*, 813 F.2d 88, 99 (6th Cir. 1987) ("It is clear that admission of hearsay evidence [at a school disciplinary proceeding] is not a denial of procedural due process."). Hearsay and its exceptions are delineated in the Federal Rules of Evidence, *see* Fed. R. Evid. 801(c), but a university student has "no right to [the] use of formal rules of evidence" at his disciplinary hearing. *Flaim*, 418 F.3d at 635 (citing *Nash v. Auburn Univ.*, 812 F.2d 655, 665 (11th Cir. 1987)). UC may still open the hearing with a Title IX report summary that includes the parties' "out-of-court" statements, and the ARC panel may still rely on those statements in deciding whether Doe is responsible for violating the Code of Conduct—it need not demand that Roe and Doe recite the evening's events from memory. We do not require schools to "transform [their] classrooms into courtrooms" to provide constitutionally adequate due process. *Jaksa*, 597 F. Supp. at 1250.

Plaintiff is likely to succeed on the merits of his due process claim not because defendants introduced hearsay evidence against him, but because the nature of that evidence posed a problem of credibility.[4] *See Flaim*, 418 F.3d at 641. Jane Roe claimed that John Doe engaged in specific acts without her consent, and John Doe replied that he did not. Although hearsay and credibility disputes often go hand in hand, use of hearsay does not itself trigger the right to question an adverse witness. Were it otherwise, the Medical College of Ohio would have violated Flaim's rights by expelling him on the basis of his "certified record of a recent felony conviction" (i.e., a hearsay record) without permitting him to cross-examine his arresting officer. *See id.* at 643; *see also* Fed. R. Evid. 803(22) (excluding evidence of a judgment of conviction

---

[4]In arguing against UC's use of Roe's hearsay statements, plaintiff assumes this evidence is necessarily harmful to his defense. Yet Doe's intended strategy is "to question Jane Roe about inconsistencies in her [prior] statements" in order to demonstrate her claimed lack of credibility. He cannot do that if her previous statements are not presented at the hearing.

from the general prohibition against the admission of hearsay).  That is not *Flaim*'s holding, and it is not our holding here.

That said, we acknowledge that witness questioning may be particularly relevant to disciplinary cases involving claims of alleged sexual assault or harassment.  Perpetrators often act in private, leaving the decision maker little choice but to weigh the alleged victim's word against that of the accused.  Credibility disputes might therefore be more common in this context than in others.  Arranging for witness questioning might also pose unique challenges given a victim's potential reluctance to interact with the accused student.  *See Regents of the Univ. of Cal.*, 210 Cal. Rptr. 3d at 505.  However, we emphasize that UC's obligations here are narrow: it must provide a means for the ARC panel to evaluate an alleged victim's credibility, not for the accused to physically confront his accuser.

The University has procedures in place to accommodate this requirement.  A month before the ARC hearing, Mitchell informed Doe and Roe that they could "participate via Skype . . . if they could not attend the hearing."[5]  Doe did not object to Roe's participation by Skype, and he does not object to this practice on appeal.  To the contrary, the record suggests that he or one or more of the ARC panelists in fact appeared at the hearing via Skype.  What matters for credibility purposes is the ARC panel's ability to assess the demeanor of both the accused and his accuser.  Indisputably, demeanor can be assessed by the trier of fact without physical presence, especially when facilitated by modern technology.  *See Craig*, 497 U.S. at 849–50, 857.  That fact mitigates UC's administrative burden.

D.

We are sensitive to the competing concerns of this case.  "The goal of reducing sexual assault[] and providing appropriate discipline for offenders" is more than "laudable"; it is necessary.  *Brandeis*, 177 F. Supp. 3d at 572.  But "[w]hether the elimination of basic procedural

---

[5]UC's Code of Conduct does not define the conditions under which a student might be "unable to attend" an ARC hearing.  In any event, this is an individual determination best left to defendants.  *See Horowitz*, 435 U.S. at 91 (the niceties of "public education . . . [are] committed to the control of state and local authorities" (citation omitted)); *see also Goss*, 419 U.S. at 578.  In the present case, there was no finding that Jane was unable to attend the hearing.

protections—and the substantially increased risk that innocent students will be punished—is a fair price to achieve that goal is another question altogether." *Id*.

Here, John Doe's private interest is substantial, and the risk of erroneous deprivation under the procedures UC followed at his ARC hearing is unacceptably high. Allowing defendants to pose questions to witnesses at certain disciplinary hearings may impose an administrative burden on UC. Yet on the facts here, that burden does not justify imposition of severe discipline without any credibility assessment of the accusing student. Accordingly, Doe has demonstrated a strong likelihood of success on the merits of his due process claim. *Planet Aid*, 782 F.3d at 323. This "often . . . determinative" factor weighs in favor of preliminary relief. *Schimmel*, 751 F.3d at 430.

V.

The second factor in our preliminary-injunction inquiry asks whether the movant is likely to suffer irreparable harm in the absence of the injunction. *S. Glazer's*, 860 F.3d at 852. In Doe's case, the district court found that he would.

"When constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Defendants' characterization of Doe's injury as "speculative or unsubstantiated" does not rebut that presumption. *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (citation omitted). Were we to vacate the injunction, Doe would be suspended for a year and suffer reputational harm both on and off campus based on a finding rendered after an unfair hearing. Accordingly, this factor weighs in favor of preliminary relief.

Defendants do not challenge the district court's findings regarding the third factor—that the preliminary injunction will not harm others.

But they do contest the fourth: the district court's finding that the preliminary injunction serves the "public good." *Doe*, 223 F. Supp. 3d at 712. In rejecting UC's claim that it has an interest in regulating and maintaining the integrity of its disciplinary system, the district court

merely reiterated that "part of Plaintiff's claim is that UC failed to follow the procedures outlined in its own disciplinary system"—namely, the requirement that Roe's statement to the ARC panel be notarized. *See id.* That UC did so is irrelevant.

A school's departure from its own hearing rules amounts to a due process violation only when the departure "results in a procedure which itself impinges on due process rights." *Flaim*, 418 F.3d at 640 (quoting *Bates v. Sponberg*, 547 F.2d 325, 329–30 (6th Cir. 1976)). The Committee's review of Roe's non-notarized statement did not "result in a procedure which itself impinge[d]" upon plaintiff's right to a fair hearing. Plaintiff's rights are dictated by the Constitution, "not internal school rules or policies." *Cummins*, 662 F. App'x at 445 n.2 (citing *Heyne*, 655 F.3d at 570, and *Hall v. Med. Coll. of Ohio*, 742 F.2d 299, 309 (6th Cir. 1984)).

The district court may have been nodding to the principle that it is always in the public's interest to prevent a violation of an individual's constitutional rights, which, it is. *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016). At the same time, while the public has a competing interest in the enforcement of Title IX, that interest can never override individual constitutional rights. U.S. Const. art. VI, cl.2. This factor is, at most, neutral.

## VI.

On balance, the preliminary injunction factors favor the grant of preliminary relief. Accordingly, we conclude that the district court did not abuse its discretion in enjoining John Doe's suspension. For these reasons, we affirm the order of the district court.