RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0395p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

JEFF LOWERY, LISA LOWERY, RANDY GILES
and MICHAEL KELLEY,

       *Plaintiffs-Appellants,*

     *v.*

JEFFERSON COUNTY BOARD OF EDUCATION,
DOUG MOODY and GREG SHARPE,

       *Defendants-Appellees.*

No. 07-6324

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 05-00570—Thomas W. Phillips, District Judge.

Argued: August 6, 2009

Decided and Filed: November 12, 2009

Before: KEITH, SUTTON and WHITE, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** G. Mark Mamantov, BASS, BERRY & SIMS, PLC, Knoxville, Tennessee, Michael S. Kelley, KENNERLY, MONTGOMERY & FINLEY, P.C., Knoxville, Tennessee, for Appellants. Linda J. Hamilton Mowles, LEWIS, KING, KRIEG & WALDROP, P.C., Knoxville, Tennessee, for Appellees. **ON BRIEF:** G. Mark Mamantov, BASS, BERRY & SIMS, PLC, Knoxville, Tennessee, Michael S. Kelley, KENNERLY, MONTGOMERY & FINLEY, P.C., Knoxville, Tennessee, for Appellants. Linda J. Hamilton Mowles, LEWIS, KING, KRIEG & WALDROP, P.C., Knoxville, Tennessee, for Appellees.

————————————

## OPINION

————————————

    SUTTON, Circuit Judge. Three parents and their lawyer filed this § 1983 action under the First and Fourteenth Amendments after being denied permission to make a repeat appearance before the Board of Education of Jefferson County, Tennessee. The district court

refused to overturn a jury verdict in favor of the defendants and awarded attorney's fees to the defendants. We affirm the jury's verdict, but we reverse the court's grant of attorney's fees.

I.

Jeff Lowery, Lisa Lowery and Randy Giles are parents of children who used to play on the Jefferson County High School football team. In October 2005, the coach dismissed their sons for challenging his leadership. *See Lowery v. Euverard*, 497 F.3d 584, 585–86 (6th Cir. 2007). After the parents complained unsuccessfully to various officials, they decided to address their concerns to the school board as a whole.

The Jefferson County Board of Education allows individuals to apply to speak for five minutes at board meetings so long as their appearances are "not frivolous, repetitive, nor harassing." Bd. of Educ. Policy 1.404, ROA 35. The board tasks the director of schools with applying this standard and gives the chairman of the board authority to limit appearances on these grounds at the meeting. Even when someone has not applied beforehand, the board sometimes will vote at the meeting to allow an individual to speak.

Lisa Lowery called the office of Doug Moody, the director of schools, and asked for speaking time at a November 10, 2005 school board meeting, saying the subject was "football." Tr. 9. Moody's secretary called her back the day of the meeting to confirm her appearance. At the meeting, an attorney, Michael Kelley, spoke on behalf of the parents. Although Kelley was polite in tone, he criticized several school officials and threatened legal action if his clients' concerns were not addressed.

Dissatisfied with the results of the November meeting, Lisa Lowery called and asked for a speaking spot at the next scheduled board meeting on December 8, 2005, again saying the subject was "football." Tr. 12–13. After receiving the request, Moody conferred with Greg Sharpe, the chairman of the board. Moody thought the speech would be (1) "harassing" because Kelley's previous speech had threatened legal action and contained "very strong, derogatory comments . . . about personnel" and (2) "repetitive" because "the speaker was the same, it was going to be the same topic." Tr. 87. Sharpe was concerned only that the appearance would be repetitive, because he "had just had a meeting with Mr.

Giles, and[,] according to Mr. Giles, most of what was going to be said there was similar to what we had heard in November." Tr. 180. They "made a joint decision" to reject the request, Tr. 179, and Moody called Giles to confirm the subject matter and notify him and the Lowerys of the denial.

The Lowerys, Giles and Kelley came to the December meeting but did not make any further request to speak. The next day the parents, represented by Kelley, filed a § 1983 lawsuit on behalf of their children against the football coach and various other school officials, alleging that the coach violated the children's First Amendment rights when he dismissed them from the team due to their criticism. The district court denied the defendants' motion for summary judgment, but our court reversed, holding that "there was no constitutional violation in [the children's] dismissal from the team." *See Lowery*, 497 F.3d at 600–01.

One week after filing the first lawsuit, the Lowerys, Giles and Kelley filed a second lawsuit, this time claiming that Moody, Sharpe and the school board violated their First Amendment rights when they refused to allow them to make a second appearance before the board. A jury found for the defendants and the district court not only denied the plaintiffs' motions for a new trial and judgment as a matter of law but also ordered the plaintiffs to pay attorney's fees (and expenses) of $87,216.49, calling their claims "frivolous" and accusing them of filing the lawsuit to harass the defendants. ROA 541–42.

II.

Federal law allows individuals to sue any person who, under color of state law, "subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. All agree that Moody, Sharpe and the school board are persons who acted under color of state law; the issue is whether their denial of the plaintiffs' second request to speak violated the First and Fourteenth Amendments. (The individual defendants have waived any qualified immunity argument by not raising it. *See Brown v. Crowley*, 312 F.3d 782, 788 (6th Cir. 2002).)

We give fresh review to the denial of the motion for a judgment as a matter of law and abuse-of-discretion review to the motion for a new trial. *See McCurdy v. Montgomery*

*County*, 240 F.3d 512, 517 (6th Cir. 2001).  A court may grant judgment as a matter of law "only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party," *Pouillon v. City of Owosso*, 206 F.3d 711, 719 (6th Cir. 2000), and may grant a new trial "only when a jury has reached a seriously erroneous result," such as when the verdict is "against the weight of the evidence" or the trial is "influenced by prejudice or bias," *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 405 (6th Cir. 2006) (citation omitted).  Because this case touches on matters of free speech, we independently examine the record as a whole but with due deference to the jury's ability to assess the credibility of witnesses.  *See Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 567 (1995).

A.

The right to free speech is not absolute, especially when a would-be speaker seeks access to government property as a platform for his speech.  The extent to which the government may regulate  speech in this setting depends on the context of the speech and the government's reasons for restricting the speech.  *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).  At one end, the government's regulatory powers are at their weakest in traditional public fora like parks and streets, which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939).  At the other end, the government has broad (though not complete) discretion to regulate speech in nonpublic fora like military bases, internal mail systems and public transit advertising spaces.  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).

The school board meeting at issue in this case falls in the middle.  While this type of meeting offers citizens a chance to express their views to the board, it cannot accommodate the sort of uninhibited, unstructured speech that characterizes a public park. *See City of Madison, Joint Sch. Dist. No. 8 v. Wis. Empl. Rel. Comm'n*, 429 U.S. 167, 175 & n.8 (1976); *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990); *Jones v. Heyman*, 888 F.2d 1328, 1331–32 (11th Cir. 1989) (per curiam).  That is why courts call this sort of forum a "designated" and "limited" public forum: "designated" because the

government has "intentionally open[ed]" it "for public discourse," *Cornelius*, 473 U.S. at 802, and "limited" because "the State is not required to . . . allow persons to engage in every type of speech" in the forum, *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). Within such a forum, the government may regulate the time, place and manner of speech so long as the regulation is (1) "content-neutral," (2) "narrowly tailored to serve a significant governmental interest" and (3) "leave[s] open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293, 295 (1984).

The board's denial of the plaintiffs' request to speak under Policy 1.404 passes this test. Here is how the policy works: It allows citizens to apply and be approved to speak for five minutes at board meetings; it provides that "[t]he director of schools shall take appropriate steps to determine that appeals or appearances before the board are not frivolous, repetitive, nor harassing in nature"; and it says that "[t]he chairman shall have the authority to terminate the remarks of any individual who does not adhere to the above rules or chooses to be abusive to an individual board member or the Board as a whole." ROA 35. In practice, the "executive committee"—the director (Moody) and chairman (Sharpe), Tr. 65—decide whether to allow a particular individual to speak, and the board may vote at the meeting to allow someone who has not gone through the screening process to speak at the meeting.

*This policy is content-neutral.* Any restriction on speech under this policy is "justified without reference to the content" of the speech, making it content-neutral on its face. *Cmty. for Creative Non-Violence*, 468 U.S. at 293. The policy's stated justifications include: "allow[ing] everyone a fair and adequate opportunity to be heard"; "assur[ing] that the regular agenda of the Board is completed"; and "recogniz[ing] the voluntary nature of the Board['s] time and us[ing] that time efficiently." ROA 35–36. Each of these justifications has nothing to do with the subject of an individual's proposed speech and everything to do with conducting orderly, productive meetings.

*The policy serves significant governmental interests.* Unstructured, chaotic school board meetings not only would be inefficient but also could deny other citizens the chance to make their voices heard. *See Jones*, 888 F.2d at 1332–33. That is why "public bodies

may confine their meetings to specified subject matter." *City of Madison*, 429 U.S. at 175 n.8.

*The policy narrowly and carefully advances these interests.* Outside the context of viewpoint-based or content-based speech regulations, *see Pleasant Grove City v. Summum*, __ U.S. __, 129 S. Ct. 1125, 1132 (2009), the regulation "need not be the least restrictive or least intrusive means" of serving the government's objective. *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800.

The school board's policy is narrowly tailored because it prohibits speech only when it is "repetitive," "harassing" or "frivolous." ROA 35. The policy thus allows almost all speech except when it is likely to interfere with the board's interests in efficient and productive meetings. *See White*, 900 F.2d at 1426 ("A speaker may disrupt a [City] Council meeting by speaking too long, by being unduly repetitious, or by extended discussion of irrelevancies."); *Jones*, 888 F.2d at 1333 (upholding removal from city commission meeting based on off-topic, disruptive and antagonistic speech); *Wright v. Anthony*, 733 F.2d 575, 576 (8th Cir. 1984) (upholding five-minute limit for speech at public hearing).

The evidence at trial supports a finding that Moody and Sharpe denied the request on the ground that the proposed speech fell into these narrowly-tailored exceptions, particularly the prohibition on "repetitive" speech. Lisa Lowery testified that she mentioned the same subject—"football"—both times she asked for speaking time. Tr. 10, 13. Moody testified that he considered this request repetitive because "the speaker was the same, it was going to be the same topic," Tr. 87, and Sharpe testified that he inferred from his discussion with Giles that "most of what was going to be said there was going to be similar to what we had heard in November," Tr. 180. On this record, the jury could fairly find that the request fell into a neutral category—"repetitive" speech— and thus was permissibly denied. *See White*, 900 F.2d at 1425 ("[A] moderator . . . certainly may stop [a speaker] if his speech becomes irrelevant or repetitious."). If, as everyone seems to agree, a moderator may limit a speaker to five minutes on a topic at any one meeting, *see Wright*, 733 F.2d at 576, he

generally should be able to limit the same speaker to five minutes on the same specific topic across two meetings.

*The policy allows ample alternative channels of communication.*  Although the policy limits the length of speaking opportunities at board meetings, it allows speech in all other contexts with few, if any, restrictions.  Tennessee law allows citizens to contact members of public bodies like the school board, *see Jackson v. Hensley*, 715 S.W.2d 605, 607 (Tenn. Ct. App. 1986)—an opportunity that the plaintiffs took ample advantage of here.  In addition to the first appearance before the board in November, the plaintiffs talked informally to the athletic director, the principal, director of schools Moody, four board members, including chairman Sharpe, and four county commissioners.  Giles compiled a booklet of information and gave it to board members.  After appearing before the board in November, Kelley sent each board member a letter restating the plaintiffs' position.  The plaintiffs held not one but two press conferences to protest the dismissals from the team.  Giles testified that he and the other plaintiffs "presented a tremendous amount of shocking information" to "every level" of decision-maker. Tr. 169.  All things considered, the policy amounted to a content-neutral time, place and manner regulation.

The plaintiffs attack this conclusion on two main fronts, neither successfully.  First, they argue that denying a request ahead of time, rather than waiting to regulate the speech after hearing it, imposes a "prior restraint" on the speaker, subjecting the denial to more rigorous scrutiny and requiring more procedural safeguards.  It is true that the defendants "restrained" the plaintiffs from speaking "prior" to the meeting, but that does not make their actions a "prior restraint" in a First Amendment sense.  In *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), the Supreme Court faced a similar challenge—a claim that Chicago's permit requirement for public events, which also had to be obtained before the public event, was a prior restraint.  The Court not only rejected the First Amendment challenge, but it also rejected plaintiffs' characterization of the requirement, treating the policy as a permissible time, place and manner regulation rather than as a prior restraint.  *Id.* at 322.  The same conclusion applies here.

The plaintiffs' second challenge—that impermissible viewpoint discrimination motivated the decision to bar the plaintiffs from speaking—is also unavailing.  No doubt,

some evidence (if credited) suggests that disagreement with the plaintiffs' viewpoint, not repetitiveness, prompted the denial of the second request. Although Sharpe cited repetitiveness as his sole motivation, Tr. 180, Moody testified that he also based his decision on a belief that Kelley's November address, although polite, was critical enough to count as "harassing." Tr. 88. He stated, for instance, that "some very strong, derogatory comments were made about personnel, . . . even to the point that if the Board did not intervene . . . there would be other action considered. I felt that was threatening." Tr. 87.

Although the school board may exclude some types of "harassing" speech—if it has the potential to disrupt the meeting, or threatens illegal acts (as opposed to the filing of a non-frivolous lawsuit)—the board may not exclude speech merely because it criticizes school officials. *See Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). Save for rare circumstances—say, speech promoting drug use at a high school event, *see Morse v. Frederick*, 551 U.S. 393, 403 (2007)—the First Amendment forbids government officials from regulating speech based on their reaction to its point of view, *see Mosley*, 408 U.S. at 96.

In this instance, however, the jury had ample bases for concluding that any potential viewpoint-based motives of the board did not affect the outcome. No violation occurs when the same result would have occurred in the absence of any illegitimate motive, *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286–87 (1977), and the mixed-motive inquiry is one for the jury, not for us, to decide, *Waters v. Churchill*, 511 U.S. 661, 681–82 (1994) (plurality); *see also id.* at 689 (Scalia, J., concurring in the judgment) (describing the causation determination as one "for the factfinder"). The district court did not give a special *Mt. Healthy* instruction here (and the plaintiffs did not request one), but it did give a general causation instruction, and explicitly warned the jury that the government may not exclude speech based on the viewpoint it expresses.

Considerable evidence supports a finding that the plaintiffs would not have received permission to speak, no matter what their viewpoint had been. Of the two decision-makers, Sharpe testified that his only concern was the repetitiveness of the speech, and Moody cited it as a partial motivation. Even then, Moody had approved the speech at the November meeting despite knowing ahead of time how critical it would be. When asked, "so you get

one chance to make harassing statements?" he replied, "I believe that's the judgment that I offered the chair." Tr. 122. Finally, although he testified that he would have granted Lisa Lowery's December request if she had called saying she wanted to praise staff members rather than criticize them, he clarified that "[b]ragging on staff and bashing staff would be different topics." Tr. 93. The jury reasonably could have understood his interpretation of "harassing" to overlap with repetitiveness, making it matter little for this case that it also included a dislike of the speaker's point of view. This conception of harassment aligns with the reality that "harassment" usually involves repetitiveness. *Cf. State v. Hoxie*, 963 S.W.2d 737, 743 (Tenn. 1998) ("The offense of harassment itself requires more than one telephone call . . . ."); *Brooks v. City of San Mateo*, 229 F.3d 917, 925–26 (9th Cir. 2000) (except in "extremely severe" cases, a claim of sexual harassment requires repetitive incidents). The jury stood on solid ground in finding no violation.

While the board and individual defendants, not surprisingly, support this conclusion, they claim there is an easier way to reach it. As they see it, they never stopped the plaintiffs from speaking because, although Moody told Giles that the request was denied, the plaintiffs still could have asked the board as a whole for time to speak at the meeting. It is not that easy. The record evidence, true enough, could support a factual finding that, had the plaintiffs asked to speak at the meeting, their request might have been granted. But there is no evidence that the defendants alerted the plaintiffs to this possibility. As a matter of law, a request that prompts the response "no, you cannot speak" generally ought to suffice to preserve a claim—especially when a written policy requires permission before speaking. If the First Amendment worries about chilling speech even when the State has not expressly forbidden anyone from speaking, *see, e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002), it should worry all the more about the chilling effects of expressly telling individuals they may not speak.

## B.

The plaintiffs next argue that the board's policy is unconstitutionally vague on its face and as applied because it gives too little notice to potential speakers about what they may say and too much discretion to the director and chairman in telling them what they may not say. Although the Due Process Clause requires "that government articulate its aims with

a reasonable degree of clarity," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984), the board's policy satisfies that standard.

Lack of notice generally poses a problem only in the context of retroactive liability. *See Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). But that problem did not arise here. Although the pre-approval process for obtaining permission to speak at board meetings creates risks of its own, it alleviates any notice problems: A party wondering whether she may speak at a meeting can ask and find out, just as the plaintiffs did here. *See Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 49 (1966), *abrogated on other grounds*, *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 342 (1989).

The discretionary aspects of the policy no doubt pose a greater risk. But Moody's and Sharpe's authority to determine that a second presentation request was "repetitive" does not necessarily create a vagueness problem. The jury reasonably could have found that Moody and Sharpe rejected the request on a neutral basis—that it was "repetitive"—which settles the as-applied challenge. As for the facial challenge, it is true that deciding what is repetitive or what is harassing requires some discretion, but that is unavoidable in this context. *See White*, 900 F.2d at 1426. For a school board to function, it must be able to keep its meetings in order, a requirement that necessarily demands that the moderator exercise some discretion over the number of speakers and the time allotted for each to speak. Courts have upheld removals from public meetings where there appears to have been no written policy at all and only a general prohibition on "disturb[ing] or interrupt[ing]" meetings, *see Jones*, 888 F.2d at 1329 n.3, or "disrupt[ing], disturb[ing] or otherwise imped[ing]" them, *see White*, 900 F.3d at 1426, making it difficult to fault the board for its written policy even if it failed to anticipate every detail of what would and would not be allowed at meetings.

## C.

Also unavailing are the plaintiffs' challenges to several of the trial court's rulings. They first argue that the court's *opening* jury instructions improperly incorporated the law on retaliatory firings by saying that the speech was protected only if it dealt with "a matter of public concern." Prelim. Jury Instr. 4–5; *see Connick v. Myers*, 461 U.S. 138, 147 (1983). But even if we grant that this was not an appropriate instruction (and we doubt that it was), any error was harmless. *See Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004, 1014 (6th

Cir. 1987).  The trial court gave proper *final* jury instructions, which included an admonition that "[t]hese instructions on the applicable law supersede any earlier statements on the law which I gave you at the start of the case."  Final Jury Charge 3.

The plaintiffs also complain that the district court refused to instruct the jury that a prior restraint can be justified only by a "clear and present danger."  But because this was a reasonable time, place and manner regulation, not a prior restraint, the premise of this argument does not exist.  The same is true of plaintiffs' argument that the district court should have excluded evidence of their other communications to the board and school officials on relevance grounds.  Because time, place and manner regulations must allow for alternative channels of communication, *see Rock Against Racism*, 491 U.S. at 791, this evidence was plainly relevant.

The plaintiffs further complain that the district court improperly commented on their counsel, saying, "Mr. Bailey, you haven't asked a relevant question in the last ten minutes," Tr. 86, and "you sure are wasting a lot of time," Tr. 97–98.  The plaintiffs provide no support for their argument that these comments prejudiced their case.  We decline, in any event, to upset a jury verdict on the grounds of a few impolite comments by the trial judge.  *See United States v. Tipton*, 11 F.3d 602, 612–13 (6th Cir. 1993).

### III.

Plaintiffs next argue that, even if we uphold the jury verdict, we should reverse the district court's decision to grant $87,216.49 in attorney's fees and expenses to the defendants.  While district courts customarily award attorney's fees to prevailing *plaintiffs* in § 1983 actions, *see* 42 U.S.C. § 1988, they may award them to *defendants* in such actions only "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation."  *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978); *see Hughes v. Rowe*, 449 U.S. 5, 14 (1980).

We review the district court's decision for abuse of discretion.  *See Garner v. Cuyahoga County Juv. Court*, 554 F.3d 624, 634 (6th Cir. 2009).  Yet because "[a]n award of attorney's fees against a losing plaintiff in a civil rights action is an extreme sanction," it "must be limited to truly egregious cases of misconduct."  *Jones v. Continental Corp.*, 789

F.2d 1225, 1232 (6th Cir. 1986). That explains why we have not hesitated to reverse such awards in the past. *See, e.g.*, *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 300 (6th Cir. 2008); *Revis v. Meldrum*, 489 F.3d 273, 293 (6th Cir. 2007); *Lisle v. Met. Gov't of Nashville & Davidson County*, 73 F. App'x 782, 791 (6th Cir. 2003); *Tahfs v. Proctor*, 316 F. 3d 584, 596 (6th Cir. 2003); *Dubuc v. Green Oak Twp.*, 312 F.3d 736, 755 (6th Cir. 2002); *Riddle v. Egensperger*, 266 F.3d 542, 553 (6th Cir. 2001); *see also Salkil v. Mt. Sterling Twp. Police Dep't*, 458 F.3d 520, 532 (6th Cir. 2006) (reversing under same standard of review for 28 U.S.C. § 1927).

These claims were not frivolous. The district court, for starters, denied the defendants' motion for judgment as a matter of law at the close of the evidence. ROA 333. It generally will be difficult to deem a claim frivolous "where the plaintiff has . . . presented sufficient evidence at trial to prevent the entry of a judgment against him as a matter of law." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 765, 771 (2d Cir. 1998); *see Sullivan v. School Bd. of Pinellas County*, 773 F.2d 1182, 1189 (11th Cir. 1985). Nor should the district court have ruled the other way on this motion. As we have shown, the evidence at trial presented a genuine question of fact about whether impermissible viewpoint discrimination caused the defendants to deny the plaintiffs' request, and sufficient evidence existed to support a jury finding in favor of the plaintiffs on the point. Where, after discovery and trial, a material question of fact exists over whether officials violated the First Amendment rights of their citizens, it is hard to maintain that the act of filing the complaint was itself frivolous.

Besides this legitimate question of fact, the case also presents legitimate questions of law. While several of our decisions have applied a First Amendment forum analysis to school board or city council meetings, they did so in unpublished decisions and without reaching the questions raised here. *See Featherstone v. Columbus City Sch. Dist. Bd. of Educ.*, 92 F. App'x 279 (6th Cir. 2004); *Hansen v. Westerville City Sch. Dist. Bd. of Educ.*, Nos. 93-3231, 93-3303, 1994 WL 622153 (6th Cir. Nov. 7, 1994) (per curiam).

Even the defendants' own conduct suggested that the complaint was not a frivolous one, as they never filed a motion to dismiss the complaint at the pleading stage or a motion for summary judgment after discovery. "A sanction is generally improper where a successful motion could have avoided any additional legal expenses by the defendants." *In re Reuben*,

825 F.2d 977, 988 (6th Cir. 1987). At oral argument, counsel explained that the defense never filed these motions because the case "raised issues of fact." But, as shown, that argument does them no good: Material fact disputes generally will preclude an award of § 1988 sanctions—at least where the plaintiff has not misrepresented the state of the evidence.

In fairness to the district court, it seemed to be less concerned about the merits of the complaint and more troubled by the plaintiffs' motives in filing it. The court saw the complaint as a continuation of the plaintiffs' "vendetta against the Board and the individual defendants," observing that "Plaintiff's [sic] lawsuit was designed not to vindicate their legal rights, but to expose the Board and the individual defendants to public obloquy, harassment, and the financial and emotional hardship of defending groundless charges . . . ." ROA 541–42. The court had reason to be frustrated. But that frustration, it seems to us, could have been directed at *both* sides of the case, as both sets of lawyers seemed to lose control of a run-of-the-mill child-parent-coach dispute, allowing it to escalate into not one, but two, federal lawsuits as well as torrents of bickering motions. *See* ROA 49–96, 128–138, 179–97.

More to the point, neither the district court nor the defendants have identified a case in which a court awarded § 1988 fees due solely to the plaintiffs' motivation in bringing the lawsuit, as opposed to the merits of the claim. It may be that, when anger or revenge lie behind a frivolous suit, a court has all the more reason to impose sanctions. *Christianburg*, for example, talks about awarding sanctions for the "bad faith" filing of a frivolous claim. 434 U.S. at 422. But it is quite another matter to award sanctions for the bad faith filing of a legitimate claim. That is why decisions "inquir[ing] into the plaintiffs' basis for bringing suit" in this setting, *Smith v. Smythe-Cramer Co.*, 754 F.2d 180, 183 (6th Cir. 1985), allude to the *legal* basis for bringing suit—what facts and law the plaintiffs knew or should have known when they sued—not merely the plaintiffs' intent in bringing the claim, *see id.*

A motive-only test for awarding § 1988 sanctions also would be difficult to apply, to say nothing of running the risk of chilling individuals from protecting their constitutional rights. Even people who legitimately think their constitutional rights have been violated may appear vindictive by the time the case is over. And of course the worst violations may lead to the most vengeful plaintiffs, meaning that the most deserving claimants may run the

greatest risk of being sanctioned.  All of these risks come to the fore in a school setting, where parents may become more aggravated about slights to their children than they ever would become about slights to themselves.  This dispute after all did not start as a debate over the rights of free speech.  It started in the sometimes-more-volatile arena of high school sports, filled with debates about playing time, fueled by a coach's philosophy about discipline and team unity and spiced with parental fealty.  While we do not envy the district court's task of handling such a dispute, we do not think the plaintiffs' motives in filing the action by themselves could warrant a fee award.

## IV.

For these reasons, we affirm the jury's verdict in favor of the defendants but reverse the award of attorney's fees in their favor.