RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0196p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KAMAL ANWIYA YOUKHANNA; WAFA CATCHO; MAREY JABBO; DEBI RRASI; JEFFREY NORGROVE; MEGAN MCHUGH,

>    *Plaintiffs-Appellants*,

   *v.*

CITY OF STERLING HEIGHTS; MICHAEL C. TAYLOR, individually and in his official capacity as Mayor, City of Sterling Heights, Michigan,

>    *Defendants-Appellees*.

No. 18-1874

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:17-cv-10787—Gershwin A. Drain, District Judge.

Argued: April 30, 2019

Decided and Filed: August 14, 2019

Before: MERRITT, MOORE, and WHITE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, for Appellants. Marc D. Kaszubski, O'REILLY RANCILIO P.C., Sterling Heights, Michigan, for Appellees. **ON BRIEF:** Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, David Yerushalmi, AMERICAN FREEDOM LAW CENTER, Washington, D.C., for Appellants. Marc D. Kaszubski, Nathan D. Petrusak, O'REILLY RANCILIO P.C., Sterling Heights, Michigan, for Appellees.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.   This case arises from the settlement of another case.   In 2015, the American Islamic Community Center (AICC) applied for zoning permission to build a mosque in Sterling Heights, Michigan.   The City's planning commission denied AICC's request, and AICC sued.   The City decided to settle the lawsuit, which alleged violations of the Religious Land Use and Institutionalized Persons Act (RLUIPA) and the First Amendment, and it negotiated a consent judgment that allowed AICC to build the mosque.   This lawsuit challenges the validity of that consent judgment, along with the legality of actions taken by the City and the Mayor during the City Council meeting at which the consent judgment was approved.   The district court granted defendants' motion for summary judgment, and we **AFFIRM**.

## I.  BACKGROUND

AICC's efforts to build a mosque on Fifteen Mile Road in Sterling Heights, Michigan spawned two rounds of litigation.  This is the second.

**A.  The Sterling Heights Planning Commission Denies AICC's Zoning Application**

On July 8, 2015, AICC applied for permission to build a mosque on Fifteen Mile Road in a neighborhood that is otherwise zoned for residential use.  Appellant Br. at 4–5; *Youkhanna v. City of Sterling Heights*, 332 F. Supp. 3d 1058, 1062 (E.D. Mich. 2018).  The Sterling Heights Planning Commission met in August to consider AICC's application.  *Youkhanna*, 332 F. Supp. 3d at 1062.  Despite a city planner's testimony that the mosque complied with all zoning criteria and was appropriately placed on a major thoroughfare, the proposal faced resistance and its approval was postponed.  *Id.* at 1062–63.  One month later, the Commission voted down AICC's updated application, giving the following reasons:

- "the location and height of the mosque interferes with and discourages the appropriate development and use of adjacent land and buildings,
- lack of size compatibility with established long term development patterns,

- a likely shortage of off-street parking when the principal and ancillary uses are combined,

- additional parking spaces are required,

- and the scale of the mosque is not harmonious with the neighboring areas."

*Id.*; R. 67-5 (Sept. 2015 Planning Commission Staff Report at 5) (Page ID #1658).

**B.  AICC Sues, and Sterling Heights Settles**

AICC then sued the City, alleging violations of RLUIPA, 42 U.S.C. § 2000cc et seq., and the First Amendment.  *Youkhanna*, 332 F. Supp. 3d at 1063.  The Department of Justice also opened an investigation into the City's denial of AICC's application.  The DOJ alleged that Jeffrey Norgrove, the commissioner who moved to deny AICC's application, had publicly demonstrated anti-Muslim bias[1] and had "improperly influenced the other Commissioners."  *Id.*

The City denied wrongdoing.  *Id.* at 1064.  Eventually, the parties (AICC and Sterling Heights) reached a settlement giving AICC "special land use approval" to build the mosque, subject to certain conditions, and the district court entered a consent judgment.  R. 67-20 (Consent Judgment at 3) (Page ID #1832).

In order to sign the settlement, however, the City Council had to vote its approval.  *Youkhanna*, 332 F. Supp. 3d at 1064.  The meeting during which the Council considered the settlement, which was recorded on video, was open to the public and well attended.  Video at 1:37:49–41:02 (Mayor Taylor:  "We have 181 seats, I believe, in this Council Chamber; every seat is taken (save for maybe one or two) and we also have overflow of at least 25 to 30 or more in the vestibule.").  The media were in attendance also, and the meeting was streamed on the City's website and YouTube channel and was broadcast on live television.  *Youkhanna*, 332 F. Supp. 3d at 1068.

---

[1]"The DOJ further alleged that Plaintiff Norgrove attended an anti-mosque protest on August 30, 2015 and improperly influenced the other Commissioners due to his alleged bias against Muslims.  In addition, the DOJ asserted that Plaintiff Norgrove opposed the construction of a different mosque in 2011 and posted anti-Islamic statements on his social media stating: 'Oh no the terrorists are gonna attack, according to the media this weekend.  Come to the Detroit area.  They don't [sic] bomb their revenue source.'  The DOJ also claimed that Norgrove shared a picture of a pig with the statement 'share this pig if your [sic] not celebrating Ramadan [sic].'  Finally, the DOJ maintained that Norgrove contacted Commissioners between the first and second meetings and informed them that he would be making a motion to deny the application."  *Youkhanna*, 332 F. Supp. 3d at 1063–64.

After the announcement that the Council would be taking up the agenda item of the consent judgment, the attorney for the City, Ann McClorey McLaughlin, explained the terms of the agreement and the City's reasons for settling the case. Video at 1:42:40. Mayor Taylor then said the floor would open to public comment, although comments would be limited to two minutes and subject to the following ground rules:

> Speakers will be required to stay on point. Your comments during this agenda item must be related to this agenda item. This agenda item is to consider settlements, consent order, and consent judgments in these two cases . . . . If you fail to abide by the Council's Rules, you will be called out of order . . . and you will be asked to go back to your seat. If you do not go back to your seat, we will recess and you will be removed from the auditorium. So please don't make us do that . . . . Outbursts from the audience can be grounds for being called out of order . . . . So again, let's just please be as respectful as we can of each person. We do not need any comments about anybody's religion, that is not the purpose of this meeting tonight and any comments regarding other religions or disagreements with religions will be called out of order. It's simply not relevant to what's going on tonight.

Video at 1:37:00–50:00.

Public comment then began, and many spoke passionately about the issue. Some people voiced concerns about issues such as traffic and noise; others disparaged Islam and AICC, calling them terrorists or terrorist-funded and saying that they wanted to "destroy the American Constitution." *Id.* at 2:00:41, 2:21:15. Whenever someone made an irrelevant comment, Mayor Taylor called that speaker out of order. *E.g.*, *id.* at 2:21:15.

Comments and deliberation were punctuated by audience outbursts, some of which necessitated a recess to restore order. *See Youkhanna*, 332 F. Supp. 3d at 1065 ("Despite Defendant Taylor's ground rules, there were twenty-six outbursts by audience members, both individually and as a body, forcing multiple recesses."). Due to the outbursts, Mayor Taylor cleared the chamber of all spectators, except the press, so that the Council could complete deliberation. (The spectators were able to remain in the vestibule.) R. 69-25 (WDIV Video No. 1).[2] The Council voted to settle the case, and the consent judgment was entered.

---

[2]https://www.clickondetroit.com/news/sterling-heights-accepts-lawsuit-settlement-in-mosque-controversy.

**C. Plaintiffs Challenge the Settlement**

On March 13, 2017, plaintiffs filed suit in the United States District Court for the Eastern District of Michigan, seeking a judgment declaring the consent judgment invalid and unenforceable, along with nominal damages, attorney's fees, and expenses. R. 1 (Compl. at 33) (Page ID #33). Plaintiffs assert seven claims for relief. Five are constitutional and range from First Amendment and Equal Protection Clause challenges to the Mayor's restrictions on public comments at the Council meeting (claims two and five), a Fourth Amendment challenge to the removal of plaintiff Debi Rrasi from the meeting (claim four), an Establishment Clause challenge to defendants' actions *in toto* (claim three), and a Due Process Clause challenge to defendants' "impermissibl[e] circumventi[on of] procedural protections, including the failure to provide proper notice and an opportunity to be heard" (claim six). R. 1 (Compl. at 26–32) (Page ID #26–32). The seventh claim asserts a violation of the Michigan Open Meetings Act. *Id.* at 32 (Page ID #32).

The first claim, however, is odd. Plaintiffs describe the ground for their first claim for relief as "Declaratory Judgment Act—Unlawful Consent Judgment." *Id.* at 26. Of course, the Declaratory Judgment Act is not a cause of action. 28 U.S.C. § 2201. Rather, it makes available a declaratory judgment "[i]n a case of actual controversy." *Id.* Construed generously, plaintiffs' first claim asserts violations of the Sterling Heights Zoning Ordinance and the Michigan Zoning Enabling Act and seeks a declaratory judgment related to those violations. R. 1 (Compl. at 26) (Page ID #26).

In June 2017, the district court denied plaintiffs a preliminary injunction. After cross-motions for summary judgment, the district court granted defendants' motion and entered a judgment in favor of defendants. R. 42 (Order Den. Mot. for Prelim. Inj. at 26) (Page ID #1273); R. 89 (Op. and Order Granting Defs.' Mot. for Summ. J. at 22) (Page ID #4464). This appeal followed.

## II. DISCUSSION

We review the grant of summary judgment de novo. *Bible Believers v. Wayne County*, 805 F.3d 228, 242 (6th Cir. 2015) (en banc). Summary judgment is appropriate if "there is no

genuine dispute as to any material fact" to present to a jury.  FED. R. CIV. P. 56(a).  When deciding a motion for summary judgment, we do not engage in "jury functions" such as making credibility determinations and weighing the evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  If there remain any material factual disagreements as to a particular legal claim, that claim must be submitted to a jury.  *Id.*

## A.  Standing

First, we must examine whether plaintiffs have standing.  Standing is apparent as to some of plaintiffs' claims:  for example, the First Amendment and Fourth Amendment claims.  Standing with respect to the claims challenging the validity of the consent judgment, however, was challenged below and warrants brief discussion.[3]

Federal courts have authority to decide only "cases" and "controversies."[4]  U.S. Const. art. III, § 2.  For standing to exist, a plaintiff must "allege an actual or imminent injury that is traceable to the defendant and redressable by the court."  *Crawford v. United States Dep't of Treasury*, 868 F.3d 438, 452 (6th Cir. 2017).  We have no trouble finding that those plaintiffs who reside near the site of the mosque have standing to challenge the validity of the consent decree.  The injury they allege is a particularized effect on their properties caused by the consent decree; a declaration that the consent decree is invalid, or an injunction barring its operation, would remedy that injury.  *See Goode v. City of Philadelphia*, 539 F.3d 311, 323–24 (3d Cir. 2008) ("[N]eighbors surely would be impacted directly by a large public facility located near them and accordingly would suffer a particularized injury from the operation of the facility very

---

[3]Although not briefed on appeal or discussed in the district court opinion, defendants and AICC did challenge plaintiffs' standing as to their claims regarding the validity of the consent judgment.  This issue was first raised by AICC in an amicus brief, following which the parties briefed the issue.  R. 27 (Amicus Br. at 8) (Page ID #1083); R. 28 (Resp. to Amicus Br. at 4) (Page ID #1116); R. 47 (Defs.' Supp. Br. on Standing) (Page ID #1282); R. 50 (Pls.' Supp. Br. on Standing) (Page ID #1405); R. 62 (Defs.' Second Supp. Br. on Standing) (Page ID #1539).  The district court flagged this issue for later discussion in its opinion denying plaintiffs' motion for a preliminary injunction, but it did not discuss the issue in its opinion granting summary judgment in defendants' favor.  R. 42 (Order Den. Mot. for Prelim. Inj. at 2 n.1) (Page ID #1249).  Of course, regardless of whether the issue was raised below or on appeal, we must determine whether standing exists.

[4]Plaintiffs seek a declaratory judgment, and so we note that the Declaratory Judgment Act applies only to "case[s] of actual controversy," thus preserving the constitutionality of the Act.  28 U.S.C. § 2201; *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–40 (1937).

different from that of the general public."). Because at least some of the plaintiffs have standing to bring the claims in this case, we consider the merits.

**B.  The Validity of the Consent Judgment—The Due-Process and State-Law Claims**

We discuss first whether the consent judgment must be invalidated because the City Council failed to follow state and local law when it voted to sign the agreement. This discussion addresses both the "declaratory judgment claim"[5] and the due-process claim. Both claims fail.

We turn first to the "declaratory judgment claim," better understood as the claim that the City violated its Zoning Ordinance and the Michigan Zoning Enabling Act by the manner in which it approved the settlement. Plaintiffs' argument on appeal is that the City Council failed to consider and make appropriate findings about a variety of factors listed in the Sterling Heights Zoning Ordinance. This, they claim, dooms the consent judgment.

Both parties ask us to examine the Zoning Ordinance to discern whether there is a distinction between the terms "reviewing authority" and "approving authority." We decline to do so. Plaintiffs accuse the City of procedural errors it did not commit; therefore, even assuming plaintiffs' interpretation of the Ordinance is correct, their claims fail.

The first alleged procedural error is a failure to consider the Zoning Ordinance's criteria for approval of a permit to build a house of worship in a residential area. These criteria are what one would expect from a zoning ordinance. For example, the criteria demand consideration of "harmony with the appropriate and orderly development of the surrounding neighborhood," traffic patterns and parking, the location and height of the building, and the new building's impact on "public health, safety and welfare." Zoning Ordinance § 25.02. It is abundantly clear from the record that the City Council *did* consider these and all other relevant criteria. Context is

---

[5]As discussed above, plaintiffs do not articulate what the underlying controversy is for which they seek a declaratory judgment. It seems that the underlying controversy is whether the Council violated the Sterling Heights Zoning Ordinance and the Michigan Zoning Enabling Act. If so, we have doubts about the soundness of this claim. It is unclear (and plaintiffs never briefed) whether the Enabling Act is enforceable by individuals. The Zoning Ordinance allows "[a] person who is aggrieved by a final decision of the . . . City Council" to appeal the decision within 30 days of the final decision. Zoning Ordinance § 25.03(F). It is far from clear whether plaintiffs qualify as "aggrieved," whether they appealed using the Zoning Ordinance process, and what, if any, the effect of failing to do so would be. Because plaintiffs' claims suffer from another fundamental flaw we need not venture into this territory, but we note that the "declaratory judgment claim" might fail for other reasons.

important.  The Planning Commission rejected AICC's application because it failed to comply, in the Commission's opinion, with certain criteria regulating noise, size and height of the building, parking, and traffic.  These are exactly the issues the consent judgment addressed by restricting the height of the mosque, stipulating to lot parking only and shuttles for large events, and banning outside sound projection.  R. 67-20 (Consent Judgment at 3-7) (Page ID #1832–36).[6]  The Council considered the terms of the settlement before approving it, just as it considered recent large developments in the area that were approved without issue by the Commission, such as a nearby 800-home development.  Video at 3:19:20.  There is no question that the City Council considered the relevant criteria before voting, and so plaintiffs' assignment of error on this ground is fruitless.

Equally unavailing is plaintiffs' argument that the Council erred by failing to make findings of fact as required by the Sterling Heights Zoning Ordinance and the Michigan Zoning Enabling Act, MICH. COMP. LAWS § 125.3101 *et seq*.  The Zoning Ordinance says that, once a special approval land use is granted, "[t]he decision shall be incorporated in a statement of findings and conclusions which specifies the basis for the decision and any conditions imposed." Zoning Ordinance § 25.03(B)(1).  In a similar vein, the Enabling Act says that "[t]he decision on a special land use shall be incorporated in a statement of findings and conclusions relative to the special land use which specifies the basis for the decision and any conditions imposed."  MICH. COMP. LAWS § 125.3502(4).

Again, plaintiffs argue that defendants failed to clear these procedural hurdles; again, plaintiffs' arguments fail because defendants fulfilled their procedural obligations.  During deliberation, Council members and Mayor Taylor considered and made findings on the relevant criteria, such as "parking, traffic and overall size of the dome and spires," before voting.  Feb. 21, 2017 Meeting Minutes at 37–40.[7]  And, if the statement of findings must be in writing, the written minutes containing the findings were adopted and published after the following City

---

[6]As the district court opinion explains, the Commission's denial of the permit based on traffic was unsupported by the record; the testimony at both Planning Commission meetings was that the mosque was to be on a major thoroughfare (as opposed to the smaller, secondary thoroughfare that the statute requires as a minimum), and so traffic increase was not a valid basis for rejecting the application.  *Youkhanna*, 332 F. Supp. 3d at 1063.

[7]https://www.sterling-heights.net/AgendaCenter/ViewFile/Item/444?fileID=2766.

Council meeting.  *Id.*  We can find no authority requiring the findings to take a particular form, nor have plaintiffs pointed us to anything indicating these written findings are insufficient.

The discussion above resolves plaintiffs' due-process arguments also.  Even if plaintiffs have a valid property interest and even if the procedures outlined by state law were constitutionally required, the fact that defendants indisputably complied with each procedure means that this claim fails.[8]

## C.  The First Amendment and Equal Protection Clause Claims

Plaintiffs' next set of claims stems from the Council's restrictions on public comment during the debate over the approval of the consent decree.  Two restrictions are relevant here. First, the Mayor required comments to be relevant to the agenda item being considered:  the approval of a settlement that would give zoning permission to AICC to build a mosque.  Mayor Taylor reiterated this rule before opening the floor to comments:

> Speakers will be *required to stay on point*.  Your comments during this agenda item *must be related to this agenda item*.  This agenda item is to consider settlements, consent order, and consent judgments in these two cases . . . . We do not need any comments about anybody's religion, *that is not the purpose of this meeting tonight* and any comments regarding other religions or disagreements with religions will be called out of order.  *It's simply not relevant to what's going on tonight*.

Video at 1:37:00–50:00 (emphasis added).

This was not, as plaintiffs would have, a ban on talking about religion.  This is clear from the fact that comments mentioning religion—including comments mentioning Islam specifically—were allowed when they were relevant to zoning issues.  For example, a person stood up to say that he had lived near a mosque previously and that mosque had hosted celebrations for a holiday that involved noise and blocking of the streets.  Video at 2:47:45.  He asked whether the Council had considered such holidays in the settlement.  *Id.*  This comment

---

[8]Plaintiffs filed a motion asking us to take judicial notice of the fact that in September 2018 plaintiff Debi Rrasi became the owner of the property she had previously been occupying and renting.  They argue plaintiff Rrasi's subsequent purchase of her home insulates their due-process claim from the argument that no plaintiff had a cognizable property interest.  Plaintiffs' due-process claim fails on other grounds, and so we deny the motion.

was not interrupted, and the speaker was not called out of order.  Another speaker questioned why the mosque was needed, given the number in the area.  *Id.* at 2:38:45.  Again, this speaker was neither warned nor called out of order.  Finally, at least one speaker was called out of order on relevance grounds for a comment wholly unrelated to religion:  explaining the process for running for City Council.  *Id.* at 2:55:54.  In sum, Mayor Taylor's admonition, viewed in context, limited comments to those relevant to the issue being considered; the mention of religion was "just a preemptive warning" against irrelevant comments about religion.  *See* R. 69-14 (Taylor Dep. at 52–53) (Page ID #2585–86).  "Religion" was *not* "off-limits for the citizen speakers" if it was relevant to zoning considerations.  Appellants Br. at 14.

The second rule enforced at the meeting was a rule against attacking persons or institutions.  Although Mayor Taylor did not announce this rule before public comment, he did enforce it.  *E.g.* R. 69-14 (Taylor Dep. at 53, 59) (Page ID #2586, 2592).

Plaintiffs argue that the above restrictions were content- and viewpoint-based prior restraints on speech that violated their First Amendment and Equal Protection Clause rights.  Appellants Br. at 35.  Specifically, Plaintiffs McHugh, Catcho, Rrasi, Youkhanna, and Jabbo claim that, although they spoke at the Council meeting, they did not make comments they otherwise would have made because of Mayor Taylor's preliminary admonition.[9]  R. 67-18 (Jabbo Dep. at 37) (Page ID #1819); R. 67-21 (McHugh Decl. at 2) (Page ID #1851); R. 67-22 (Youkhanna Decl. at 2) (Page ID #1855); R. 67-23 (Rrasi Decl. at 2) (Page ID #1859); R. 67-24 (Catcho Decl. at 2) (Page ID #1863).

In order to assess this restriction on speech, we must first determine what type of forum the Council meeting was.  A City Council meeting is not a "traditional public for[um] like parks and streets," the sort of setting in which "the government's regulatory powers are at their weakest."  *Lowery v. Jefferson Cty. Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009).  Rather, City Council meetings, like the school-board meeting at issue in *Lowery*, "cannot accommodate the sort of uninhibited, unstructured speech that characterizes a public park.  That is why courts

---

[9]Plaintiffs do not specify whether their claim is facial or as-applied, but they argue throughout their briefs that the restriction violated plaintiffs' rights specifically, and they do not address factors relevant to a claim of facial unconstitutionality.  We therefore interpret their claims as as-applied challenges.

call this sort of forum a 'designated' and 'limited' public forum: 'designated' because the government has 'intentionally open[ed]' it 'for public discourse,' and 'limited' because 'the State is not required to . . . allow persons to engage in every type of speech' in the forum." *Id.* (internal citations omitted).

In a limited public forum, the government can impose reasonable restrictions based on speech content, but it cannot engage in viewpoint discrimination. The Supreme Court explained this in *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995):

> The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics. Once it has opened a limited forum, however, the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not "reasonable in light of the purpose served by the forum," nor may it discriminate against speech on the basis of its viewpoint. Thus, in determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.

*Id.* at 829–30 (internal citations omitted).

Here, there were two content-based limitations on speech: the relevance rule and the rule forbidding attacks on people and institutions. The relevance rule was certainly "reasonable in light of the purpose served by the forum." *Id.* at 829 (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)). We can think of no content-based restriction more reasonable than asking that content be relevant. Plaintiffs insist that Mayor Taylor's preliminary oral admonition was a ban on mentioning religion, but it is clear from context that Mayor Taylor was reiterating the relevance rule.

Next, the relevance rule is viewpoint-neutral. Plaintiffs argue they were forbidden from discussing the topic at issue from a religious perspective, but that is not so. When the government opens a forum to discussion of a certain topic, it is viewpoint discrimination to ban discussion *of that topic* from a religious perspective. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 108 (2001); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384,

392–94 (1993). That is not this case, however, despite plaintiffs' protestations to the contrary. Here, the City Council opened the floor for discussion of whether it should approve or deny the consent decree—in other words, to relevant comments. Mayor Taylor allowed comments mentioning religion or Islam when the comment was relevant to zoning considerations—for example, noise and traffic—but not when the comment was irrelevant—for example, expressing the commenters' preference not to live near Muslims. (Presumably, comments expressing approval of the consent decree because of a desire to live near Muslims would have been considered equally irrelevant; no such comments were attempted.) This restriction is not viewpoint discrimination. Irrelevant comments of any sort, from any viewpoint, were out of order. Therefore, the relevance rule is not constitutionally problematic.

The second rule, which forbade attacks on people or institutions, is a more difficult case. Certainly, this rule could be construed as viewpoint discrimination, although Mayor Taylor testified that the rule does not forbid "disparaging comment[s]," but rather "making an attack." R. 69-14 (Taylor Dep. at 59) (Page ID #2592). *Matal v. Tam* does not address speech in limited public forums, but does at least suggest that the "attack rule" could be considered viewpoint discrimination. 137 S. Ct. 1744, 1763 (2017) (stating that "[g]iving offense is a viewpoint"). *But see Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth., WMATA*, 901 F.3d 356, 364 (D.C. Cir. 2018), *cert. denied*, 2019 WL 400746 (June 3, 2019) ("The relevance of [*Matal*,] in which the Supreme Court did not engage in a forum analysis at all escapes us; *Matal* did not discuss forum doctrine in any depth because *Matal* dealt not with the Government permitting speech on government property but with government protection of speech from commercial infringement.").

We need not address the constitutionality of Sterling Heights's no-attack rule, however, because there is no dispute in the record that plaintiffs' comments were restricted by the entirely appropriate relevance rule. Plaintiffs Catcho, Rrasi, Youkhanna, Jabbo, and McHugh spoke at the Council meeting but claim that they were "unable to express [their] views regarding the proposed Consent Judgment agenda item." *E.g.*, R. 67-24 (Catcho Decl. at 2) (Page ID #1863). Each plaintiff had the opportunity to testify as to what they would have said, absent the speech restriction, at a deposition. Three—Jabbo, Catcho, and Youkhanna—would have spoken about

their desire not to live near Muslims because of persecution due to religious conflict in the Middle East, and in some cases because of their personal experiences of being persecuted for practicing Christianity. R. 67-14 (Youkhanna Dep. at 59–60) (Page ID #1796) (explaining he was prevented from describing the history of persecution of Christians in the Middle East); R. 67-17 (Catcho Dep. at 35–36) (Page ID #1813) ("Q. What is the reason you came? A. I don't want [Muslims] to be near me. Q. Why? A. Because they scare me."); R. 67-18 (Jabbo Dep. at 37) (Page ID #1819) ("Q. Earlier in the deposition you testified as to some of the objections you had about the construction of this mosque, one of them being persecution that your family members experienced in Iraq by Muslims; is that right? A. Yes. . . . Q. Now did you express any of those views at the council meeting . . . ? A. No, because I was not allowed."). Although we hold great sympathy for plaintiffs for any suffering they endured, these comments were not relevant to the Council's consideration of the settlement. Plaintiffs' comments boil down to the sentiment that the Council should have refused zoning permission because plaintiffs do not want to live near a mosque. The Council cannot refuse zoning permission on these grounds, consistent with RLUIPA. That leaves Ms. Rrasi and Ms. McHugh. During her deposition, Ms. Rrasi said that she wanted to speak "about religion." R. 69-20 (Rrasi Dep. at 43) (Page ID #2959). Ms. McHugh wanted to "address[] the preferential treatment . . . [and] the fact that the AICC was so quick to go to lawsuit." R. 67-19 (McHugh Dep. at 39) (Page ID #1826). Ms. Rrasi's statement is entirely vague, and no reasonable jury would be able to conclude based on it that her speech was restricted—the Council allowed some comments about religion, and did not allow others, depending on relevance. Ms. McHugh's deposition is befuddling; plaintiffs argue in their briefs that they wanted to speak from a religious viewpoint but were prevented from doing so. We cannot fathom how Ms. McHugh's desire to comment on the fact that AICC sued or received "preferential treatment" was restricted. In sum, of the plaintiffs who were able to testify with specificity about the views they were prevented from expressing at the meeting, all stated they wanted to make comments that were irrelevant. Plaintiffs' speech was thus prohibited by the relevance rule alone. The relevance rule was constitutional, and so plaintiffs' First Amendment claims fail.

Plaintiffs' equal-protection arguments fail for the same reasons. The City did not, in fact, "grant the use of a forum to people whose views it finds acceptable, but deny use to those

wishing to express less favored or more controversial views."  Appellants Br. at 41 (quoting *Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972)).

**D.  The Establishment Clause Claim**

Plaintiffs' next claim, that defendants violated the Establishment Clause, draws from elements of the discussion above.  Plaintiffs argue that the City violated the Establishment Clause because its actions had the effect of endorsing Islam.  Appellants Br. at 46.  They identify a series of actions that led to an "unmistakable message of approval of adherents to Islam and disapproval of those who were not (in particular, the Chaldean Christians, such as [some of the] Plaintiffs)":

- "(1) [approval of] the Consent Judgment, which was not required by RLUIPA, . . . in violation of the zoning regulations,"
- "(2) [suppression of] speech deemed critical of Islam during the City Council meeting,"
- and "(3) [the display of] hostility to those who opposed the building of the mosque at this meeting."

Appellants Br. at 47.  This claim is grounded in mischaracterizations of the record and already-rejected arguments, and therefore fails.

First, as we explain above, the Council did not approve the mosque "in violation of the zoning regulations."  Second, neither the City nor the Mayor suppressed speech critical of Islam; they limited discussion to the topic at hand, and plaintiffs'—or anyone else's—views on Islam were largely irrelevant to the Council's decision.  Finally, plaintiffs cite no cases standing for the proposition that their individual perceptions that a government body was displaying "hostility to" them are sufficient to find an Establishment Clause violation.

**E.  The Open Meetings Act Claim and the Fourth Amendment Claim**

Plaintiffs' final two claims relate to actions the Mayor and Council took to maintain order during the meeting.  First, they argue that the decision to remove the audience from Council chambers during deliberations violated Michigan's Open Meetings Act.  Second, they argue that

the decision to eject plaintiff Debi Rrasi from the meeting was an unlawful seizure in violation of the Fourth Amendment.  Both arguments fail.

### 1.  The Open Meetings Act

The Open Meetings Act provides that, in general, "[a]ll meetings of a public body shall be open to the public and shall be held in a place available to the general public.  All persons shall be permitted to attend any meeting except as otherwise provided in this act. . . . However, a public body may establish reasonable rules and regulations in order to minimize the possibility of disrupting the meeting."  MICH. COMP. LAWS § 15.263(1).  It requires also that "[a]ll decisions of a public body shall be made at a meeting open to the public" and provides that "[a] person shall not be excluded from a meeting otherwise open to the public except for a breach of the peace actually committed at the meeting."  *Id.* § 15.263(2), (6).

During the meeting at issue, the Mayor and Council decided to remove the audience from Council chambers to the vestibule during deliberations.  R. 69-25 (WDIV Video No. 1).[10]  This happened after public comment closed and after people in the audience began shouting over the Council members who were discussing the agenda item.  The press was allowed to stay in the Council chambers, and audience members could see the deliberations from the vestibule in which they were allowed to remain.  *Id.*  Deliberations were broadcast and recorded.

Even assuming the removal of the audience violated the general provisions of the Act, there was clearly "a breach of the peace actually committed at the meeting."  MICH. COMP. LAWS § 15.263(6).  The recording of the meeting shows an audience-wide uproar, and so removal of the audience followed.  We note that a Michigan court has held already that the City and Mayor's actions at this very meeting did not violate the Open Meetings Act; we agree.  R. 69-24 (*Naumovski v. City Council of Sterling Heights*, No. 2017-0899 at 4–5 (Macomb Cir. Ct. June 2, 2017)) (Page ID #3263–64).

---

[10]https://www.clickondetroit.com/news/sterling-heights-accepts-lawsuit-settlement-in-mosque-controversy.

## 2.  The Fourth Amendment Claim

The final issue in this case is the Mayor's decision to remove plaintiff Debi Rrasi from the meeting.  Ms. Rrasi brings this claim against both the City and Mayor Taylor.  It fails as to both defendants.  Although we address this claim on the merits, we do not hold that plaintiffs have cleared the procedural hurdle of showing municipal liability as to the City, nor do we hold that Mayor Taylor is unprotected by legislative immunity.

The undisputed facts regarding Ms. Rrasi's removal from the Council meeting are that she approached the dais and engaged with Mayor Taylor during a recess, and that she was gesticulating and speaking loudly while doing so.  R. 69-20 (Rrasi Dep. at 47–49) (Page ID #2963–65); R. 69-14 (Taylor Dep. at 101–02) (Page ID #2634–35).  Mayor Taylor asked the police to escort her out, and at least two police officers executed the order.  R. 69-14 (Taylor Dep. at 102–03) (Page ID #2635–36).  While leaving the Council chamber, Ms. Rrasi stopped, turned around, and started yelling at the Council.  R. 69-20 (Rrasi Dep. at 53) (Page ID #2969).  At some point during the process of escorting Ms. Rrasi from the building, one of the officers "grabbed [her] arm so [she] could leave," "tapped [her]," "held [her] hand all the way till [sic] [she] got to the doors," and "was pushing [her] out the door basically.  That's how [she] felt." *Id.* at 51, 53–54 (Page ID #2967, 2969–70).  She was removed from the building but not otherwise detained.  *Id.* at 51 (Page ID #2967).  Ms. Rrasi asserts that she did not feel "free to leave at [her] own will" during this encounter.  *Id.* at 50 (Page ID #2966).

Ms. Rrasi argues that she was seized the moment that Mayor Taylor ordered her out of the Council chambers, but that is not so.  In fact, Ms. Rrasi was not seized at all.  Although she asserts that she did not feel "free to leave" during this encounter, "the Supreme Court has recognized [that] the 'free to leave' test may not be the best measure of a seizure where a person has no desire to leave the location of a challenged police encounter." *Salmon v. Blesser*, 802 F.3d 249, 253 (2d Cir. 2015).  Indeed, the "free to leave" test is hardly applicable in this situation, where Ms. Rrasi wished to remain rather than leave.  In *Florida v. Bostick*, the Supreme Court held that "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter" was an appropriate test to determine whether a seizure occurred when someone was asked for consent to search his bag while on a bus that he

did not want to exit.  501 U.S. 429, 434–36 (1991).  *Bostick*, however, is equally inapplicable. Officers were not asking Ms. Rrasi for consent or engaging in a voluntary interaction with her; rather, they were ordering her to leave a place she wanted to be.

The Second Circuit addressed a similar situation in *Salmon v. Blesser*, in which a man was ordered out of a courthouse and eventually violently ejected.  *Salmon*, 802 F.3d at 251. There, it was held that when police officers "order persons to leave public areas . . . such police conduct, without more, [is not] a seizure under the Fourth Amendment as long as the person is otherwise free to go where he wishes."  *Id.* at 253.  This is true even if "police . . . take a person by the elbow or employ comparable guiding force short of actual restraint to ensure obedience with a departure order."  *Id.*  A person is seized, however, if officers use force beyond "guiding force," force that is "painful" and not necessitated by "resistance" on the part of the person being rejected. *Id*. at 254.

We are inclined to agree with the Second Circuit, at least in circumstances where the person being asked to leave is not privileged to remain in the space—either because the space is no longer open to the public (for example, a building is closing or the space must be cleared of all people for safety reasons) or because the person's behavior violated a rule, ordinance, or law (for example, by causing a disturbance).  *Cf. Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005) (holding that a police officer who ordered bicycle riders to leave an affluent suburb and escorted them across the municipal boundary had conducted a seizure).  Here, Ms. Rrasi lost her privilege to remain in the otherwise-public meeting.  First, Mayor Taylor made clear during the meeting that citizens were allowed to address the Council only once, and admonished people attempting to speak for a second time.  Ms. Rrasi's attempt to address the Council for a second time thus violated Council rules.  Furthermore, this is not an instance of a citizen attempting to engage in dialogue with a public official during an otherwise-quiet moment. The recess during which Ms. Rrasi approached Mayor Taylor was called because the audience was yelling and disrupting deliberations.  It was called for the purpose of restoring order, and Ms. Rrasi's behavior, which undisputedly involved loud speech and gesticulation, contributed to the disruption.  It is common sense that a government body should be allowed to remove people

who are disrupting a public meeting, and the Michigan Open Meetings Act allows for such a removal.  Appellees Br. at 42.

Ms. Rrasi lost her privilege to remain in the public meeting because of her behavior.  Her description of the force used by officers to escort her out—holding her hand or arm, tapping her—does not exceed guiding force, especially in light of her mid-exit refusal to leave the Council chambers.  There was certainly no painful force, and Ms. Rrasi's freedom was unrestricted once she exited the building.  Because there was no seizure, Ms. Rrasi's Fourth Amendment rights were not violated, and summary judgment in favor of defendants was appropriate.

As a final point, and to avoid confusion, we address the fact that Ms. Rrasi insists on characterizing this action as Mayor Taylor retaliating against her based on the content of her speech.  Ms. Rrasi did not pursue on appeal the First Amendment retaliation claim stated in her complaint.  Furthermore, there is no evidence in the record supporting the retaliation allegations.

### III.  CONCLUSION

For the reasons discussed above, we **AFFIRM**.