RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0164p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DARBI BODDY,

> *Plaintiff-Appellant,*

*v.*

No. 25-3490

MARY GRECH, individually and in her official capacity as President of the Board of Education of the Xenia Community City School District; XENIA COMMUNITY SCHOOLS BOARD OF EDUCATION,

> *Defendants-Appellees.*

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Dayton.
No. 3:24-cv-00327—Michael J. Newman, District Judge.

Argued: March 19, 2026

Decided and Filed: June 10, 2026

Before: GRIFFIN, BUSH, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Curt C. Hartman, THE LAW FIRM OF CURT C. HARTMAN, Cincinnati, Ohio, for Appellant. Bernard W. Wharton, MCCASLIN, IMBUS & MCCASLIN, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Curt C. Hartman, THE LAW FIRM OF CURT C. HARTMAN, Cincinnati, Ohio, Christopher P. Finney, FINNEY LAW FIRM LLC, Cincinnati, Ohio, for Appellant. Bernard W. Wharton, MCCASLIN, IMBUS & MCCASLIN, Cincinnati, Ohio, for Appellees.

GRIFFIN, J., delivered the opinion of the court in which BUSH and NALBANDIAN, JJ., concurred. BUSH, J. (pp. 16–22), delivered a separate concurring opinion.

---

**OPINION**

---

GRIFFIN, Circuit Judge.

During a public comment period of a Xenia School Board meeting, plaintiff Darbi Boddy attempted to express her views regarding the school district's alleged teaching of critical race theory. In prepared remarks, delivered in a calm and deliberate manner, Boddy took issue with the "cowardice" of the school district's superintendent and characterized the Board as "failing." Displeased with the speech, Board president Mary Grech threatened to turn off Boddy's microphone. Forty seconds later, as some in the audience became disruptive in reaction to Boddy's remarks, defendant Grech abruptly seized Boddy's microphone and recessed the meeting. Boddy was denied her allotted five minutes of public comment, and she was not offered any additional time to address the Board when the meeting resumed.

Boddy brought this action seeking vindication of her First Amendment rights. The district court denied Boddy's motion for a preliminary injunction, ruling that she had failed to demonstrate a strong likelihood of success on the merits or irreparable harm. We disagree. Accordingly, we reverse and remand for the entry of a preliminary injunction in Boddy's favor.

I.

Defendant Xenia Community Schools Board of Education (the Board) governs the school district for Xenia, Ohio. Mary Grech is one of five members of the Board and sits as Board president. Gabriel Lofton serves as the superintendent for the school district. Jeremy Cox was elected to the Board in 2023; since then, he has advocated for an audit of the district's alleged teaching of critical race theory to students.

On October 9, 2024, superintendent Lofton emailed a letter to members of the community, voicing his opposition to Cox's continual efforts toward auditing the district's curriculum. The letter said, "To be entirely clear, Critical Race Theory is not being taught now, and has not been taught in the past." His letter explained Cox's persistence, the school's efforts

to quell the inquiry, and that the issue would be placed on the agenda for the October 14 board meeting.

The October 14 board meeting was well attended, and some attendees recorded the meeting. Some members of the public, including Boddy, attended in support of Cox. Others supported Lofton. When it came time for Boddy to speak, she addressed the Board calmly and deliberately:

> My name is Darbi Boddy and I live in West Chester. I am a previous Board of Education member for the Lakota School District; I am on the board of Protect Ohio Children and represent the southern part of Ohio and the organization responsible for the heat map. I am also a leader for Moms for America in Butler County. I recently heard about the failing Xenia Board of Education and the cowardice [sic] superintendent who cannot perform adequately in his role . . . .

After speaking for only twenty-eight seconds, president Grech interrupted Boddy, shouting "Excuse me!" Boddy, however, continued. Quickly, Grech again yelled, "Ma'am, excuse me I will cut your mic." Undeterred, Boddy continued to methodically read from her prepared remarks:

> This superintendent reprimanded the one good board member who was doing [his] due diligence and asking questions so he could better understand the teaching environment, make educated decisions to determine what is best for the students of Xenia and therefore help create an educational environment free of racism and division, as is his job per ORC and school policy. It appears quite obvious this board and superintendent do not advocate for transparency and want to continue pushing racist and divisive ideologies to the children of Xenia and indoctrinate them into an anti-American agenda . . . .

At this point, some in the crowd began to heckle Boddy with loud boos, which continued for approximately fifteen seconds.

About a minute and twenty seconds into Boddy's remarks and amid loud boos, Grech moved to recess the meeting, which another Board member quickly seconded. Yet Boddy continued to speak. A few seconds later, Grech walked up to the podium and took the microphone away as Boddy was speaking. Some in the crowd cheered; others jeered and booed. Boddy continued speaking, without a mic, as the Board shuffled out of the room.

Although Boddy was prevented from using her allotted five minutes of public comment, the Board did not offer Boddy any additional time to finish her remarks after the recess.

Boddy sued the Board and Grech under 42 U.S.C. § 1983, asserting a First Amendment claim. She moved to preliminarily enjoin the Board from enforcing its policy against her speech at future meetings. The district court held a hearing and heard testimony from Boddy, superintendent Lofton, and president Grech.

Board Policy 0169.1 governs public participation at Xenia's school board meetings. On its face, the policy applies "to all speakers and does not discriminate based on the identity of the speaker, content of the speech, or viewpoint of the speaker," and the policy is designed to keep meetings "productive and efficient." The policy empowers the presiding officer (here, Grech) to regulate the meetings with several basic rules: (1) each speaker is limited to a five-minute period unless extended by the presiding officer; (2) "[a]ll statements shall be directed to the presiding officer; no person may address or question Board members individually"; and (3) the participation portion of the meeting is not meant to be an interactive exchange between the Board and the public.

Policy 0169.1 also provides that the presiding officer may (1) "interrupt, warn or terminate a participant's session when they make comments that are repetitive, obscene, and/or comments that constitute a true threat (i.e., statements meant to frighten or intimidate one [] or more specified persons into believing that they will be seriously harmed by the speaker or someone acting at the speaker's behest)"; (2) "request any individual to stop speaking and/or leave the meeting when that person does not observe reasonable decorum or is disruptive to the conduct and/or orderly progress of the meeting"; (3) request law enforcement to remove a disorderly person; (4) "call for a recess or an adjournment to another time when the lack of public decorum so interferes with the orderly conduct of the meeting as to warrant such action"; and (5) "waive these rules with the approval of the Board."

At the preliminary injunction hearing, Boddy testified that she believed her statements were appropriately directed to the entire Board, not individual members. She acknowledged that she expressed "strong disapproval" of the Board but that she was also "calm" and abiding by the

decorum rule.  She acknowledged that other individuals, who also supported Cox's proposed curriculum audit, were able to speak at the meeting without disruption.  But this was only after Grech took the microphone away from her and after the recess.

Grech offered several reasons for curtailing Boddy's speech.  First, Grech stated that she did so because Boddy "was starting down the path of calling [people] names."  Next, Grech thought Boddy directed language "strictly to the [s]uperintendent," which she claims violated the Board's rules of decorum and amounted to "just inciting the crowd basically."  But Grech conceded that her threat to cut Boddy's microphone may have helped "rile up" the audience.  She also testified that in her view, criticism of the Board and superintendent was not a "school matter."  Grech also took issue with Boddy's "tone" and "how she was talking."  Specifically, Grech thought that Boddy was focusing on the superintendent and not making eye contact with the Board as she spoke.  Later, however, Grech conceded that Boddy mostly read from her prepared speech, which necessitated looking down, and acknowledged that Boddy was not speaking directly at superintendent Lofton while she read.  According to Grech, she prevented Boddy from speaking not because of her views, but because Boddy was calling people "names" and spreading "baseless accusations."

In defense of her actions, Grech noted that she admonished another speaker at the Board meeting, Amber Boddie, who spoke in support of the superintendent.[1]  Grech chided Amber Boddie for not addressing the entire Board, just superintendent Lofton, but never took the microphone from her.

Boddy testified that—despite her desire to speak again—she felt "threatened" and "a little frightened" about speaking at a Xenia Board meeting without court intervention.  She also suggested that if she were to speak again, she would want to criticize the Board and its members and use "names or epitaphs [sic] such as tyrant."

After the hearing, the district court acknowledged that Boddy's criticism of the Board in the limited public forum was indeed subject to some First Amendment protection.  But the district court characterized some of her speech, particularly the phrase "cowardice [sic]

---

[1]To avoid confusion with plaintiff Boddy, we will refer to Amber Boddie by her full name.

superintendent," as an ad hominem attack unprotected by the First Amendment. On whether Grech's regulation of Boddy's speech was reasonable, the district court found a factual roadblock. It explained that Boddy failed to show success on the merits because the record "at times favor[ed] Plaintiff . . . and at other times favor[ed] Defendants." Based on the testimony, the district court found that Grech's initial interjection appeared to escalate the crowd's response to Boddy's speech—"some members of the public began to speak out" "slightly after" Grech interrupted Boddy. On Boddy's heckler's veto theory, the district court held it was too close to decide because of Grech's apparent mixed motives. Regarding irreparable harm, the district court found Boddy's evidence insufficient. The district court did not address the last two preliminary injunction factors.

In the end, the district court denied Boddy's motion for a preliminary injunction because it concluded that Boddy failed to show a likelihood of success on the merits and irreparable harm. Boddy appealed.

## II.

"We review a district court's legal conclusions de novo, its factual findings for clear error, and its ultimate decision to grant or deny preliminary relief for abuse of discretion." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). Although we independently apply the Constitution, we defer to the district court's overall balancing of the preliminary-injunction factors. *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015). For our preliminary injunction analysis, we consider: "(1) whether the movant has demonstrated a strong likelihood of success on the merits; (2) whether he would suffer irreparable injury without the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether issuing the injunction would serve the public interest." *Doe*, 872 F.3d at 399 (citing *Planet Aid*, 782 F.3d at 323). "A preliminary injunction is an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation modified), one that should "only be awarded upon a clear showing that the [party] is entitled to such relief," *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

III.

When a case turns on a potential constitutional violation, "the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam) (citation modified). To show a strong likelihood of success on the merits, Boddy must show "more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). At the same time, she "is not required to prove [her] case in full." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citation modified).

Boddy advances two merits arguments: (1) defendants exercised viewpoint discrimination and (2) defendants ratified a heckler's veto. To defeat these claims, the Board and Grech rely on the Board's policies, Grech's admonishment of a speaker with views opposite Boddy's, and the need to maintain decorum at its school board meetings.

A.

The First Amendment provides, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. To determine the constitutionality of the government's restriction of speech, we assess (1) whether the speech is protected under the First Amendment, (2) the forum at issue, and (3) whether the regulation comports with the constitutional safeguards associated with that forum. *S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 559 (6th Cir. 2007) (citing *Parks v. City of Columbus*, 395 F.3d 643, 647 (6th Cir. 2005)). The parties agree, and our precedent holds, that a school board meeting is a "limited public forum." *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009) (citation modified). "In a limited public forum, the government can impose reasonable restrictions based on speech content, but it cannot engage in viewpoint discrimination." *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 519 (6th Cir. 2019).

Boddy argues that her speech—particularly the descriptors "failing" and "cowardice"—are protected by the First Amendment, even in a limited public forum. Thus, Boddy contends Grech engaged in viewpoint discrimination when she stifled her speech. We agree.

1.

We begin with whether Boddy's speech is protected by the First Amendment. Boddy's speech criticized most of the Board as well as superintendent Lofton. Boddy described the Board as "failing" and used "cowardice" to describe the actions of superintendent Lofton.

The Supreme Court has recognized distinct categories of speech that are traditionally not entitled to First Amendment protection. *See e.g.*, *New York v. Ferber*, 458 U.S. 747, 765–66 (1982) (child pornography); *Roth v. United States*, 354 U.S. 476, 481 (1957) (obscenity); *Beauharnais v. Illinois*, 343 U.S. 250, 266 (1952) (defamation); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (fighting words). But outside of these narrow exceptions, the First Amendment protects a person's speech. *See Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026); *Bible Believers v. Wayne County*, 805 F.3d 228, 243 (6th Cir. 2015) (en banc) ("The First Amendment offers sweeping protection that allows all manner of speech to enter the marketplace of ideas.").

Boddy's speech does not fall into any of these unprotected categories. Boddy's use of "failing" and "cowardice" do not constitute fighting words. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 409 (1989) ("No reasonable onlooker would have regarded Johnson's generalized expression of dissatisfaction with the policies of the Federal Government as a direct personal insult or an invitation to exchange fisticuffs."); *Greene v. Barber*, 310 F.3d 889, 896 (6th Cir. 2002) (explaining the "fighting words" doctrine is narrow). Nor was her speech obscene, as it did not appeal to a "shameful or morbid interest in sex." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985) (citing *Roth*, 354 U.S. at 487 n.20). She did not utter any "threatening, profane or obscene revilings" either. *Chaplinsky*, 315 U.S. at 573. Boddy criticized the Board and the superintendent for their policy decisions, all while maintaining a calm demeanor and tone.

And even if Boddy's speech was offensive, the First Amendment protects this kind of speech. *Bible Believers*, 805 F.3d at 243 (collecting cases). A contrary rule would permit "a majority to silence dissidents," *Cohen v. California*, 403 U.S. 15, 21 (1971), and allow the government to ban "the expression of unpopular views," *id.* at 26. But the Court's precedents

are clear: the government's regulation of offensive speech may constitute viewpoint discrimination.  *See Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality opinion) (holding that the "anti-disparagement" clause of the Lanham Act discriminated based on viewpoint because "[g]iving offense is a viewpoint"); *Iancu v. Brunetti*, 588 U.S. 388, 390 (2019) (holding that the Lanham Act's bar on registering "immoral[] or scandalous" trademarks violated the First Amendment because it disfavored certain ideas); *see also Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 500 (6th Cir. 2020) (striking down a restriction prohibiting buses from running ads "likely to hold up to scorn or ridicule any person or group of persons" because the restriction allowed for viewpoint discrimination).

"The government may not censor speech merely because it is offensive to some." *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 894 (6th Cir. 2021) (citation modified).  Even seemingly neutral rules that ban "attacks on people or institutions" "could be considered viewpoint discrimination."  *Youkhanna*, 934 F.3d at 520.  And regardless of the forum, viewpoint discrimination is impermissible.  *Cf. Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) (explaining that in a limited forum, "a government entity may impose restrictions on speech that are reasonable and viewpoint neutral").

Considering these principles, the district court was correct to conclude that the bulk of Boddy's speech was protected by the First Amendment.  But it erred when it characterized some of Boddy's speech as an ad hominem attack not protected by the First Amendment.

First, we have never held that an ad hominem attack is per se unprotected speech.  And any indication otherwise in *Ison* is dicta.  Thus, it was error for the district court to cite it as our precedent.  Nor has the Court held that ad hominem attacks are without First Amendment protection.  In fact, *Matal* and *Iancu* suggest that Boddy's speech is protected *because* giving offense is a viewpoint.

Second, as a factual matter, Boddy's speech was not an ad hominem attack.  Boddy was criticizing the Board and superintendent for their policy choices as public employees.  An ad hominem attack is a "personal dig or affront . . . [or] the criticism of an adversary's character as opposed to the substance of the adversary's arguments."  *Attack*, *Black's Law Dictionary* (12th

ed. 2024). Boddy's speech was not personal or related to the character of any individual Board member. She did not address any member by name and merely characterized the Board as "failing." And even the use of "cowardice" to describe the superintendent's actions was related to his performance in his public facing role.

"Freedom to criticize public officials and expose their wrongdoing is at the core of First Amendment values." *Barrett v. Harrington*, 130 F.3d 246, 263 (6th Cir. 1997); *see B. A. v. Tri Cnty. Area Schs.*, 156 F.4th 782, 799 (6th Cir. 2025) (Bush, J., dissenting). Accordingly, we hold that Boddy's speech was protected under the First Amendment.

2.

The Board and Grech's claim that curtailing Boddy's speech was necessary to maintain decorum at the Board meeting is also unavailing. The district court demurred, concluding that the "evidence points to Grech's possible mixed motives for curtailing" Boddy's speech, which a jury should decide, not the district court on a motion for a preliminary injunction. We disagree. Grech's justification for cutting Boddy's speech reveals that she curtailed Boddy's speech because she shared viewpoints critical of the Board. And the district court clearly erred when it failed to scrutinize Grech's contradictory testimony.

To be sure, the government may have a constitutional basis for regulating some speech. *Lowery*, 586 F.3d at 435. For example, there is no viewpoint discrimination "when the same result would have occurred in the absence of any illegitimate motive." *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286–87 (1977)). And the "mixed-motive inquiry is one for the jury, not for us, to decide." *Id.* (citing *Waters v. Churchill*, 511 U.S. 661, 681–82 (1994)). This is because when the record is unclear whether censorship was reasonable or the product of viewpoint discrimination, it can be impossible to determine any likelihood of success on the merits. But this case is not one of those.

Here, the record shows that Grech's application of the rules to Boddy's speech was not content neutral. Grech testified that she made the threat to cut the microphone because Boddy "was starting down the path of calling [people] names." But we condemned this precise rationale in *Ison* as impermissible viewpoint discrimination. 3 F.4th at 894–95. Although Grech

claimed later that she admonished Boddy because of how she was speaking, not because of what she was saying, the district court erred to the extent that it credited this portion of her testimony because the record shows otherwise.

First, consider the idea that Grech cut off Boddy because of her hostile tone. As the district court found—and the video evidence confirms—Boddy's tone and demeanor were objectively professional and consistent with proper decorum. So this first rationale is no help to defendants. Second, that some of Boddy's speech was directed at Lofton alone does not make it unprotected. *See Ison*, 3 F.4th at 895 (holding that a policy that banned "personally directed" speech was facially unconstitutional). Third, the video shows that Boddy did not incite the crowd. To the contrary, Grech acknowledged that her threat to cut the microphone may have riled up the crowd. The video corroborates this understanding. And the district court similarly found that Grech, not Boddy, may have incited the crowd. Fourth, the fact that Grech chided Amber Boddie as well does not demonstrate an even hand: Amber Boddie did not have the microphone ripped away from her, nor did the Board recess during her speaking slot. Quite simply, Amber Boddie was allowed to speak, but Boddy was not.

Grech's other testimony regarding Amber Boddie's reprimand is also problematic because it suggests that speech critical of the Board would violate the decorum rule, but speech praising the Board would not. The Board "may not exclude speech merely because it criticizes school officials." *Lowery*, 586 F.3d at 435.

A factual finding is clearly erroneous when the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (citation modified). Here, the district court failed to make definitive credibility determinations, or probe into Grech's testimony. Instead, the district court framed the facts in the light most favorable to each side, and then determined it was too close to call. But courts have to make these calls, "even the tough ones." *Generation Changers Church v. Church Mut. Ins. Co.*, 168 F.4th 354, 365 (6th Cir. 2026). The correct call here is that defendants provided no legitimate reason to regulate Boddy's speech. The evidence in the record demonstrates that Grech curtailed Boddy's speech because Boddy shared views critical of the Board and Lofton. Thus, we conclude that defendants engaged in impermissible viewpoint

discrimination.  Accordingly, Boddy has shown a strong likelihood of success on the merits of her First Amendment claim.

B.

Boddy offers a second basis for us to conclude she will likely succeed on the merits— Grech ratified a heckler's veto based on the crowd's reaction to her speech.  Boddy asserts that Grech curtailed her protected First Amendment speech, succumbing to the crowd's reaction to it. Defendants counter that no evidence shows that Boddy's speech was subject to a heckler's veto. We disagree and hold that, even in a limited public forum, the government can perpetuate a heckler's veto, which is what it did here.

The "First Amendment does not permit a heckler's veto." *Bible Believers*, 805 F.3d at 252; *see also United States v. Trump*, 88 F.4th 990, 1015 (D.C. Cir. 2023) ("Of course, the First Amendment generally does not allow speech to be restricted because of some enthusiastic audience members' reactions.").  Rooted in the idea that the government cannot favor one citizen's speech over another, *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 828 (1995), we have held that speech "does not lose its protection under the First Amendment due to the lawless reaction of those who hear it," *Bible Believers*, 805 F.3d at 252. And "[p]unishing, removing, or by other means silencing a speaker due to crowd hostility will seldom, if ever, constitute the least restrictive means available to serve a legitimate government purpose." *Id.* at 248.

In *Bible Believers*, a group of anti-Muslim evangelists attended Dearborn's Arab International Festival with the goal of converting patrons with their offensive and anti-Muslim messages.  *Id.* at 235–36.  At the event, the group was surrounded by "youthful hecklers" who began throwing "bottles and other garbage at the Bible Believers."  *Id.* at 241.  The police officers' focus was on the evangelists, and they asked that the group stop using their megaphone to amplify their controversial speech.  *Id.*  We held that the police officers "effectuated a heckler's veto by cutting off the Bible Believers' protected speech in response to a hostile crowd's reaction."  *Id.* at 243.

Although *Bible Believers* concerns a heckler's veto in the context of a public forum with police as the relevant government actors, several important throughlines surface regardless of the forum at issue. When a "peaceful speaker" engages in protected speech and "is confronted by a hostile crowd, the state may not silence the speaker as an expedient alternative to containing or snuffing out the lawless behavior of the rioting individuals." *Id.* at 252. Nor can the government "sit idly" by as the crowd imposes a "tyrannical majoritarian rule." *Id.* at 253. It should "take any appropriate action to maintain law and order that does not destroy the right to free speech by indefinitely silencing the speaker." *Id.*

We have yet to apply the heckler's veto to a limited public forum, but its application flows logically from our First Amendment jurisprudence. After all, a heckler's veto theory is another way to show impermissible viewpoint discrimination—which is improper regardless of the forum at issue. *Youkhanna*, 934 F.3d at 519. As the Ninth Circuit has explained, a "claimed fear of hostile audience reaction could be used as a mere pretext for suppressing expression because public officials oppose the speaker's point of view." *Seattle Mideast Awareness Campaign v. King County*, 781 F.3d 489, 502 (9th Cir. 2015). Situations could arise "where the asserted fears of a hostile audience reaction are speculative and lack substance, or where speech on only one side of a contentious debate is suppressed." *Id.* at 502–03. Similarly, the Third Circuit has suggested that a heckler's veto theory hinges on whether the government's actions were based on the content of the speech. *See Startzell v. City of Philadelphia*, 533 F.3d 183, 200 (3d Cir. 2008) (discussing the breadth of heckler's veto jurisprudence and explaining that "the more germane question is whether the [government's] actions were based on the content of the speech").

Under this framework, the heckler's veto test turns into a fact-bound test for viewpoint discrimination—here, whether Grech used the disorderly crowd as a pretext to stifle Boddy's speech. The facts suggest that Grech sanctioned a heckler's veto and in fact gave rise to it. Boddy shared an unpopular view, and some in the crowd tried to shout her down. Grech made no effort to quiet the crowd before moving for a recess. She also testified that she may have helped rile up the audience when she threatened to cut the mic. As in *Bible Believers*, the government actor did not protect the speaker from the crowd but silenced the speaker in an effort

to maintain decorum.  And because of the forum, Grech had more control over the proceedings than an officer on the street.  The Board's policies empowered Grech to regulate the meetings for reasonable decorum, and she could have used her authority to quiet the crowd instead of Boddy.  Instead, she threatened to cut Boddy's microphone and then did just that.  Further, Boddy was not offered the opportunity to finish her speech after the recess.  So Boddy can show a likelihood of success on the merits under her heckler's veto theory as well.

*        *        *

In sum, the proofs demonstrate that Grech curtailed Boddy's speech because of the viewpoint she expressed.  The district court erred when it credited Grech's proffered reasons for limiting the speech when Grech's reasons were unconstitutional, inconsistent, or plainly unreasonable.  The district court also erred by not deciding the question.  We answer affirmatively that defendants engaged in unconstitutional viewpoint discrimination, under either her forum-based theory or her heckler's veto theory.  Boddy can therefore show "more than a mere possibility of success." *Six Clinics Holding Corp.*, 119 F.3d at 402.

IV.

The second preliminary injunction factor turns on whether the movant is likely to suffer irreparable harm without an injunction.  *Doe*, 872 F.3d at 407.  The district court found that Boddy failed to show irreparable harm.  However, "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *see also Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).  The Board and Grech have failed to rebut the presumption of irreparable harm.

Finally, it is "always in the public's interest to prevent a violation of an individual's constitutional rights." *Doe*, 872 F.3d at 407.  Boddy has a fundamental right to share her views.  Although the public has an interest in orderly school board meetings, *Lowery*, 586 F.3d at 433, the public interest also favors an unbridled marketplace of ideas, especially when those ideas are unpopular or critical of a government official, *see, e.g.*, *Lichtenstein v. Hargett*, 83 F.4th 575, 583 (6th Cir. 2023) ("The First Amendment's protections reach their 'zenith' for political speech.").  Accordingly, the equitable factors also favor Boddy.

V.

The district court abused its discretion when it denied Boddy's motion for a preliminary injunction. Accordingly, we reverse the district court and remand with instructions to issue the requested preliminary injunction.

---

**CONCURRENCE**

---

JOHN K. BUSH, Circuit Judge, concurring.  I agree with the majority opinion and join it in full.  I write separately to highlight why this case is important.  At first glance, the dispute looks somewhat blown out of proportion.  It involves a plaintiff quite literally making a federal case out of five minutes of public comment at a school board meeting for a school district where she does not reside.  But a closer look reveals this case goes beyond that.

Regardless of the impact that Darbi Boddy's words might have, the First Amendment protects her from having moderators give in to the demands of the masses.  "[A] function of free speech under our system of government is to invite dispute." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949).  It "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Id.*  A heckler's veto disrupts this purpose and ends a dispute before it can even begin.  In the modern day, we have seen our fair share of crowds stifling free speech and debate.[1]  This problem, however, is not new, and history can give us insight into both the dangers and the solutions.

Several events touching on American slavery illustrate the point.  In the lead up to the Civil War, mobs, vigilantes, wealthy slaveholders, and even the House of Representatives took extreme measures to prevent abolitionist ideas from spreading.  While the caning of Senator Charles Sumner might be the most widely known instance of stifling debate in Congress's halls,[2] a longer lasting veto existed in the House for many years before and after.  We know it as the gag rule.

---

[1]Jessie Appleby, *What UCLA doesn't want you to know*, Foundation for Individual Rights and Expression (May 8, 2026), https://www.fire.org/news/what-ucla-doesnt-want-you-know;  Sabrina Conza & Alex Morey, *Stanford Law students shut down 5th Circuit judge: A post-mortem*, Foundation for Individual Rights and Expression (March 13, 2023), https://www.fire.org/news/stanford-law-students-shout-down-5th-circuit-judge-post-mortem.

[2]*See* Zaakir Tameez, *Charles Sumner: Conscience of a Nation* 194–200 (2025).

The story begins in the 1830s, with former President John Quincy Adams, son of former President and American Founder John Adams, serving as a representative for Massachusetts in the House of Representatives.  As a Congressman, Adams had such a strong commitment to representative government that he would read aloud on the House floor all petitions that he received from his constituents.[3]  As time went on, more and more of these petitions came from abolitionists asking Congress to end the interstate slave trade.  Rather than listen to these petitions on the House floor and debate their merits, another American Founder's son, Henry Laurens Pinckney, proposed a gag rule, which the House passed.  This rule automatically tabled all petitions relating to slavery or its abolition, "consign[ing them] to oblivion."[4]  John Quincy Adams virulently opposed the gag rule, but he was silenced each time he attempted to express his opposition.[5]

Temporary gags were readopted in 1837 and 1838, with Adams again expressing his outrage over the House silencing his constituents and infringing on his own freedom of speech.[6]  But Adams's efforts at revoking the rules were unsuccessful.  Then, in 1840, the House implemented a stronger form of the gag rule.[7]  Under the prior gag rules, a representative could still present the petition to the House, and the congressional record would reflect that the petition was raised.  The petition simply had no chance of success.  Under the new rule, "an abolitionist petition could not even be presented by a member so that it could be formally received, tabled,

---

[3]Akhil Reed Amar, *Born Equal: Remaking America's Constitution, 1840–1920* 136 (2025); James Traub, *John Quincy Adams: Militant Spirit* 433 (2016).

[4]Amar, *supra* note 3, at 136.

[5]*Id.* at 136–37.  During the vote on the gag rule, Adams proclaimed, "I hold the resolution to be in direct violation of the Constitution of the United States, the rules of this House, and the rights of my constituents."  This was all he could get out before being "hooted and gaveled into silence . . . ."  *Id.*; *see also* Traub, *supra* note 3, at 433.

[6]*Journal of the House of Representatives*, 25th Cong., 2d sess. 89 (Dec. 22, 1837); *Congressional Globe*, 25th Cong., 3rd sess., 27–28 (Dec. 12, 1838).

[7]*Congressional Globe*, 26th Cong., 1st sess., 130 (Jan. 20, 1840).

and buried."[8]  This new rule was a permanent one, so it did not need to be voted on again during each session.[9]

But Adams found his way around these gags (even the 1840 one) and continued speaking out for free soil and the end of slavery.  He would do so by presenting petitions arguing against the gags themselves rather than against slavery, against the annexation of Texas (which had strong implications for the perpetuation of slavery),[10] or, in one instance, through a petition that called for the capital to be moved farther north "where the principles of the Declaration of Independence are not treated as a mere rhetorical flourish."[11]  These workaround petitions allowed Adams to raise his constituents' concerns, address the evils of slavery, and gain attention from newspapers across the country.

The Senate, meanwhile, elected not to adopt an outright gag.  Though they by no means performed any better as ambassadors for First Amendment liberties.  In 1836, South Carolina Senator John C. Calhoun attempted to follow the lead of his fellow South Carolinian, Pinckney, and impose a gag rule in the Senate that would prevent petitions on slavery from being debated in the Senate chamber.[12]  Although many of the Southern senators agreed with the sentiment, they worried that denying citizens their civil right to petition would only benefit the abolitionist movement by turning "the troublesome enemies of slavery . . . into noble champions of civil liberties."[13]

As it turns out, those senators were right.  The longer Adams struggled against the gag rule, the more attention he received.  Continually trying to shut down debate and prevent the free

---

[8]Amar, *supra* note 3, at 137.

[9]*Id.* at 137–38.

[10]Jane Armstrong Hudiburg, *John Quincy Adams: Fiery to the End*, U.S. Capitol Hist. Soc'y, *Capitol Stories* (2025), https://capitolhistory.org/USCHS-Capitol-Stories-files/USCHS-Capitol-Stories-John-Quincy-Adams.pdf.

[11]*Id.*

[12]*Slavery Petitions and the Gag Rule*, U.S. Senate, https://www.senate.gov/about/powers-procedures/rules-procedures/slavery-petitions-gag-rule.htm (last visited May 12, 2026).

[13]*Id.*

exchange of ideas only led to shining a brighter spotlight on Adams, and on the abolitionist cause.[14]

But it was not only members of Congress who wanted to silence debates on slavery. Pro-slavery activists relied on mob rule to silence the abolitionist cause rather than debate the issues on their merits and risk losing the argument. This was what happened on December 3, 1860. One month after Abraham Lincoln's election to the Presidency and less than a month before South Carolina would announce its plan to secede from the United States, Frederick Douglass met with fellow abolitionists in Boston to discuss how slavery could be defeated.[15] But before they could begin in earnest, a violent mob disrupted the proceedings and forced the meeting to be abandoned. Six days later, Douglass, remembering the events of the first meeting, asked for the opportunity to give some remarks on what transpired there. He followed with a powerful defense of free speech.

Even though the initial meeting occurred in Massachusetts, the home of John Quincy Adams, it was nonetheless "invaded, insulted, [and] captured, by a mob of gentlemen, and thereafter broken up and dispersed by order of the Mayor, who refused to protect it, though called upon so to do."[16] Douglass's characterization of the mob as "gentlemen" was pointed— the mob was comprised of men who "who pride themselves upon their respect for law and order."[17] But the law they respected was not the Constitution. "The law of free speech and the law for the protection of public meetings they trampled under foot, while they greatly magnified the law of slavery."[18] Douglass implored his audience to embrace free speech as "the great moral renovator of society and government."[19] Mob rule was the perpetuator of slavery, and free speech the thing that would drive it out. Douglass knew that "[s]lavery cannot tolerate free

---

[14]Amar, *supra* note 3, at 140.

[15]Frederick Douglass, *A Plea for Freedom of Speech in Boston*, The Frederick Douglass Papers (Dec. 9, 1860), https://frederickdouglasspapersproject.com/s/digitaledition/item/9060.

[16]*Id.*

[17]*Id.*

[18]*Id.*

[19]*Id.*

speech.  Five years of its exercise would banish the auction-block and break every chain in the South."[20]

Given this historical context, we can turn to what happened at the Xenia school board meeting.  I do not mean to make a direct comparison between what transpired here and the abolitionist efforts against slavery.  The denial of public comment at a school board meeting is, of course, not the same thing as what happened in the run-up to the Civil War.  But speech is speech, and the right to petition applies equally at all levels of government, even locally.

I am reminded of Lincoln's Lyceum Address,[21] in 1838, over twenty years before he would assume the Presidency.  Then, he spoke on the dangers of mob rule, sharing examples from his time of vigilante mobs taking the law into their own hands.  He asked, "What has this to do with the perpetuation of our political institutions?"[22]  And he answered: "[I]t has much to do with it.  [Mob rule's] direct consequences are, comparatively speaking, but a small evil; and much of its danger consists, in the proneness of our minds, to regard its direct, as its only consequences."[23]  Put differently, the consequences of shutting down speech go well beyond preventing that individual speaker from expressing his ideas.

It would be a mistake to discount the importance of speech at a school board meeting.  The direct consequences of shutting down a person's public comments are not the only consequences.  Preventing citizens from exercising their rights of speech and petition leads to contempt for First Amendment rights such that the "the walls erected for the defense of the persons and property of individuals, are trodden down, and disregarded."[24]  And when our rights go unprotected, we lose faith in government and the law more generally.  Lincoln warned of this,

---

[20]*Id.*

[21]Abraham Lincoln, *Address Before the Young Men's Lyceum of Springfield, Illinois: The Perpetuation of Our Political Institutions*, (Jan. 27, 1838), https://www.abrahamlincolnonline.org/lincoln/speeches/lyceum.htm.

[22]*Id.*

[23]*Id.*

[24]*Id.*

too: we cannot always know when danger is approaching, but "if it ever reach us, it must spring up amongst us."[25]

These historical examples help diagnose the problem. Danger is creeping up amongst us. Ordinary people and those in power alike are shutting down the free exchange of ideas and attempting to silence their fellow citizens.

Thankfully, history also provides the solution. First, the way to fight against the restriction of speech is through more speech. Adams and Douglass did not remain quiet after their speech was disrupted; they continued advocating for the freedom of speech, despite widespread hostility to their views. For the second, I again turn to Lincoln: "As the patriots of seventy-six did to the support of the Declaration of Independence, so to the support of the Constitution and Laws, let every American pledge his life, his property, and his sacred honor . . . ."[26] The counter to mob rule, to shout downs, to the heckler's veto, is a love and devotion to the Constitution and the law. Those who venerate the Constitution cannot tolerate a heckler's veto because "interpreted as it ought to be interpreted, the Constitution is a glorious liberty document,"[27] "and [l]iberty is meaningless where the right to utter one's thoughts and opinions has ceased to exist."[28] The two are inseparably intertwined.

I recognize that protection of unpopular speech will not always be easy. Many speakers spread ideas that inflame our passions and cause great hurt or offense. But instead of relying on passion as our guide when faced with offensive or harmful ideas, we must turn instead to

---

[25]*Id.*

[26]*Id.*

[27]Frederick Douglass, *What to the Slave Is the Fourth of July?*, Teaching American History (July 5, 1852), https://teachingamericanhistory.org/document/what-to-the-slave-is-the-fourth-of-july/; *see also* Bradley Rebeiro, *Frederick Douglass and the Original Originalists*, 48 BYU L. Rev. 909, 913–16 (2023) (describing Douglass's originalist interpretation of the Constitution as a pro-liberty document).

[28]Douglass, *supra* note 15.

reason.[29] For "cold, calculating, unimpassioned reason, must furnish all the materials for our future support and defen[s]e."[30]

The dispute at issue here may not be the most important that we as federal judges will see in our time on the bench, but today we vindicate the right to speak. "No right was deemed by the fathers of the Government more sacred than the right of speech."[31] I hope that we as citizens will do as Lincoln suggested and pledge ourselves to upholding this sacred right, even when we do not like what the speaker has to say. Because while the danger of shouting down a speaker may seem slight in its direct consequences, the indirect consequence to the rule of law may be profound.

[29]Lincoln, *supra* note 17.

[30]*Id.*

[31]Douglass, *supra* note 15.